IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JASON TROY STANDLEY and | § | |
| SHANNON DAVINA STANDLEY | § | Case No. 22-40689 |
| | § | |
| Debtors | § | Chapter 7 |
| | § | |
| KENNETH STANDLEY | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 22-04048 |
| | § | |
| JASON TROY STANDLEY and | § | |
| SHANNON DAVINA STANDLEY | § | |
| | § | |
| Defendants | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court issues these findings of fact and conclusions of law after conducting trial in the above adversary proceeding. Plaintiff seeks to except from discharge an alleged debt of Jason Standley (the "Debtor" or "Defendant") arising from bank loans, the payment of which Plaintiff allegedly guaranteed, pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6).[1] Plaintiff also objects to Jason and Shannon Standleys' (together "Debtors" or "Defendants") entire discharge pursuant to 11 U.S.C. § 727(a)(4)(A) for multiple alleged false oaths and failing to properly disclose their assets.[2] Defendants deny all of Plaintiff's allegations. Both parties appeared through counsel at trial.

---

[1] *See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, Adv. No. 22-4048, ECF No. 10. *See also* Order Dismissing Count 3 from Plaintiff's Complaint and Further Dismissing as Moot Defendant Jason Standley's Motion for Partial Summary Judgment as to Count 3 [523(a)(4)], Adv. No. 22-4048, ECF No. 81.

[2] Plaintiff's Original Complaint, Adv. No. 22-4048, ECF No. 1.

1

These findings dispose of all remaining issues pending before the Court in the above adversary regarding Plaintiff's Original Complaint against Jason Standley pursuant to 11 U.S.C §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6), and Defendants' entitlement to a discharge pursuant to 11 U.S.C § 727(a)(4)(A). These findings and conclusions constitute the Court's findings of fact and conclusions of law and fact pursuant to Fed. R. Civ. P. 52, made applicable to adversary proceedings by Fed. R. Bankr. P. 7052. Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

## I.  Findings of Fact

1.      The Court entered its Joint Pre-Trial Order[3] on April 25, 2025.

2.      Trial in this proceeding was held beginning on April 28, 2025.[4]

3.      For purposes of clarity, the Court will refer to the parties by their first name because all share the same last name.

4.      Plaintiff's Exhibits[5] 1, 2, 8, 9, 19, 25, 29, 36, 37, 58, 59, 61, 67, 68, 87, 94, 95, 96, 105, 106, 108,[6] 109,[7] and Ex. I as attached to the Original Complaint,[8] were offered and admitted. All other Plaintiff's exhibits were either not offered or were not admitted. No offer of proof was made by Plaintiff of any exhibits excluded.

5.      Defendants' Exhibits[9] C, D, G, I, K, L-1, P, Q, R, T 1-4, V, W, X, AA, AC, AD, AE, AF, AH, AI, AJ, AK, AL, AS, AU, AW, AZ, BB, BC, BE, BF, BJ (see supplement) were offered and admitted. All other of Defendants' exhibits were either not offered or were not admitted. No offer of proof was made by Defendants of any exhibits excluded.

---

[3] ECF No. 120.

[4]  ECF No. 101.

[5]  *See* Pl. Am. Ex. List, ECF No. 117.

[6]  *See* Pl. Supp. to Ex. List, ECF No. 126.

[7]  *See* Pl. Supp. to Ex. List, ECF No. 127.

[8]  Pl. Compl., ECF No. 1.

[9]  *See* Def. Am. Ex. List, ECF No. 118.

*The Family*

6.    Kenneth Standley (the "Plaintiff") graduated from Sam Houston State University with a degree in business.

7.    Kenneth and Renee were married for 33 years.  They divorced in the fall of 2014 but remained close friends at the time of trial.

8.    Kenneth has two sons from a prior relationship, Adam and Jason.

9.    Adam has two children, Loren and Addison.

10.   Together, Kenneth and Renee have a son, Jordan, who lives in Germany.

11.   Jason married Shannon in November 1991.  Jason was in the United States Navy from approximately 1991 to 1999.  During this time, they lived first in San Diego, California, and later moved back to Texas in 1995 where Jason completed his service as a reservist.  Jason does not have any college degrees, but did earn one or more military certificates.  Jason and Shannon have two sons, Aaron and Preston.

12.   Jason, Kenneth, and Renee testified as the only witnesses at trial.

*The Business – P.M. Standley*

13.   Kenneth has been in the business of wholesaling cars since 1965.

14.   Kenneth opened "P. M. Standley Corporation" d/b/a P.M. Standley Motorcars ("P.M. Standley") in Dallas around 1981.

15.   Kenneth traveled across the country, buying cars, and sending them back to P.M. Standley.  After arriving a P.M. Standley, cars bought at auctions were cleaned, repaired, and then sold wholesale to other car automobile dealers.  P.M. Standley profited by selling cars to other dealers for more than was paid at auction.

16.   Kenneth testified that if P.M. Standley's line of credit was used to purchase cars at auction, P.M. Standley would quickly pay off the line of credit debt.

17.   Renee worked for P.M. Standley from 1996 until 2015.  During this time, she computerized their office systems.  Renee was responsible for keeping track of car titles, maintaining accounts payable, and monitoring "accounts receivable," among other duties.

18.   "Accounts receivable" was used at trial not in the traditional sense of money owed by a vendor or purchaser to P.M. Standley.  Rather, all parties used the term in

3

reference to an internal P.M. Standley accounting mechanism by which employee expenses charged to a corporate account or credit card were tracked and reconciled. During her employment at P.M. Standley, Renee was responsible for these "accounts receivable." She testified that business expenses were tracked and accounted for, and any amounts listed in a particular employee's account receivable was paid off at the end of the fiscal year. She also testified that if any employee used an "account receivable" for personal reasons, that employee would be required to repay P.M. Standley for these personal charges at the end of the month in which they were incurred. Renee made sure the "accounts receivable" were not used unnecessarily and that they did not carry over from year-to-year. In part she did this by reviewing American Express statements.

19.     Kenneth testified he is not technologically adept. At trial Kenneth testified Renee still manages his emails and prints documents for him when needed. Renee confirmed this through her testimony. She said Kenneth does not know how to use a computer, and cannot print or scan documents. He did not take to P.M. Standley's new systems once they were computerized by Renee.

20.     In 2012, while the wholesale part of P.M. Standley's car business continued, P.M. Standley also began selling cars directly to retail customers. Kenneth testified that P.M. Standley would sell at retail around 20 to 30 cars per month. This new retail business was due to Jason's new employment at P.M. Standley.

21.     During this time, and before the loans at issue in this proceeding were made by BTH Bank, N.A., P.M. Standley had a loan with NextGear Capital, Inc. ("NextGear") secured by its cars.[10] In the course of business, when P.M. Standley sold a car securing this loan, it would have to notify NextGear, pay off the required portion of the NextGear loan, and ask NextGear to release the title and lien on the car to be sent to the buyer. Under this process, payment of the loan to NextGear was secured by NextGear's possession of car titles. Kenneth testified that a representative of NextGear visited P.M. Standley each week to inspect its inventory of cars.

22.     Kenneth did not personally guarantee the NextGear loan. Instead, Kenneth Standley, LP, and KS Enterprises, LLC, guaranteed the NextGear loan. Kenneth signed these NextGear guaranties only in his capacity as principal or manager of these entities.[11]

---

[10] Ex. AU.

[11] *Id.*

4

23.    P.M. Standley also had a loan during this time with Texas Capital Bank, N.A. ("Texas Capital") for up to $2,500,000.00.[12]  Kenneth testified he used this loan as a line of credit to purchase vehicles at auction and would pay it off after sales of those vehicles were completed.

24.    Kenneth and Jason each personally guaranteed the Texas Capital loan according to the Sixteenth Modification Agreement of that loan, which is the only Texas Capital loan document in evidence.[13]

25.    The Sixteenth Modification Agreement recites May 15, 2019 as the "Maturity Date" of the Texas Capital loan.  For at least ten years, P.M. Standley had a business relationship with Texas Capital.

26.    Paul Noonan worked at Texas Capital during its business relationship with P.M. Standley.  Jason testified that Paul Noonan was a dear family friend.  Paul Noonan was also a co-trustee of the Kenneth Standley FLP Trust.[14]

27.    In 2012, at Kenneth's request, P.M. Standley's value was appraised.  Afterwards, Kenneth decided to create a family limited partnership for inheritance purposes.  To do this, Kenneth transferred his stock in P.M. Standley to the Kenneth Standley FLP.[15]  This stock was the only asset of Kenneth Standley FLP.

28.    Kenneth Standley LP was general partner of the Kenneth Standley FLP.

29.    Kenneth was managing member of KS Enterprises LLC.[16]  KS Enterprises LLC is the general partner of Kenneth Standley LP.  Kenneth Standley LP owns 2% of the voting rights in the Kenneth Standley FLP.

30.    Kenneth Standley FLP was owned, according to Renee, in the following proportions by various family members:

    a.  Jordan – 39%
    b.  Jason – 34%

---

[12]  Ex. AS.

[13]  *Id.*

[14]  Ex. 8.

[15]  Ex. AA, Stock Certificates for P.M. Standley Corporation.

[16]  Ex. W.

    c.  Adam – 5%
    d.  Preston – 5%
    e.  Aaron – 5%
    f.  Loren – 5%
    g.  Addison – 5%
    h.  Kenneth Standley LP– 2%

    Total = 100%

31. Kenneth testified that Jimmy Bennet, P.M. Standley's accountant, helped him form these entities.

*Jason Takes Over P.M. Standley*

32. Prior to 2012, Jason had worked at P.M. Standley, having grown up around the car business.  He worked as a "drafter"—finding cars at auctions to sell wholesale.  Jason's income from this work fluctuated.

33. In 2012, Jason became a full-time employee of P.M. Standley.  His duties included helping with retail operations.

34. Later in 2014, Jason was promoted to become a Director of P.M. Standley.  His duties in that new role did not change much, if any.  He was also appointed Secretary and Treasurer of P.M. Standley.

35. On November 26, 2017, Kenneth formally resigned as President, Vice President, and any other officer positions of P.M. Standley.[17]  The same day, Jason was elected President, Secretary, and Treasurer of P.M. Standley.[18]  Jason remained in these positions until May 24, 2022, after P.M. Standley had closed in late February 2021.[19]

36. Kenneth testified he give Jason control of P.M. Standley because they were family and because he was convinced by Jason that he could grow its business.  After surrendering control to Jason, Kenneth was no longer involved in the day-to-day business decisions of P.M. Standley.  Kenneth was removed from its bank accounts, and did not earn a salary.

---

[17] Ex. V.

[18] Ex. V.

[19] Ex. BF.

37.     One of Kenneth's last acts was to sell the real property from which P.M.
        Standley's business operated and which was pledged to Texas Capital.  Jason
        testified he was not happy with this decision.  This sale meant P.M. Standley was
        required to pay higher monthly rent for its business location.

38.     Jason testified that as of 2017, P.M. Standley owed approximately $1,200,000.00
        to Texas Capital and $7,700,000.00 to NextGear.

39.     Jason testified he started considering, and at least mentioned to Kenneth the
        possibility of, refinancing the existing Texas Capital and NextGear loans
        sometime in early 2018.  This change was, at least in part, due to Texas Capital's
        decision not to renew P.M. Standley's loan.

*Obtaining the BTH Bank, N.A. Loans*

40.     Jason searched for a new lender and decided to pursue new financing with BTH
        Bank, National Association ("BTH").  The BTH representative with whom Jason
        primarily dealt was Jim Bloodgood.

41.     BTH made two loans to P.M. Standley on June 19, 2019.  The first loan was a line
        of credit for $1.5 million.[20]  The second loan was for $8.5 million.[21] Both had the
        same maturity date of May 1, 2020, named P.M. Standley as Borrower, and were
        guaranteed by Jason, Kenneth, the "Jason Standley Trust," and the "Kenneth
        Standley FLP Trust."

42.     No security agreements describing the collateral securing payment of either of
        these loans were admitted into evidence.  However, the parties' testimony agreed
        that these loans were secured by the vehicle inventory of P.M. Standley.  Jason
        testified that the smaller of the new BTH loans was contemplated to operate as a
        line of credit, and the larger as an inventory finance loan.  Further, the parties'
        testimony agreed that the proceeds from these loans satisfied the pre-existing
        indebtedness owed by P.M. Standley to Texas Capital and NextGear.

43.     While negotiating with BTH to obtain these two new loans, Jason communicated
        with Kenneth by numerous text messages[22] and telephone calls.[23]  These

---

[20] Ex. 8.

[21] Ex. 9.

[22] Ex. AI.

[23] Ex. AD.

communications between Kenneth and Jason regarding the execution of these two
BTH loans is the core of this case. Their text messages, phone call logs, and
emails provide the main evidence concerning the parties' intentions for obtaining
these BTH loans for P.M. Standley.

44.    On May 20, 2019, at 2:26 PM (CST), Kenneth texted Jason and asked for Jim
Bloodgood's (the BTH loan officer) telephone number. Kenneth wanted to speak
with him about the terms of the BTH loans, specifically whether there were ". . .
alternatives available other than giving up the 2%. Thx." [24] The 2% refers to
Kenneth's ownership interest in Kenneth Standley LP.

45.    Kenneth and Jason had the following text exchange regarding the BTH loan term
negotiations:

   a.  Kenneth: "That's why I would like to talk to the bank about any
       other options."
   b.  Jason: "I'll talk to him to see other options."
   c.  Jason: "the last term sheet proposal that was sent over to me for
       review still had you as the 2% GP and not personal guarantor. Only
       as a sign or for the trust. He was going change it but maybe he got it
       done as it is. I'll ask if he got it done that way after all."
   d.  Kenneth: good. [25]

46.    On May 22, 2019, at 11:09 A.M. (CST), Jason texted Kenneth with Mr.
Bloodgood's phone number and told Kenneth BTH still wanted Kenneth's 2%
interest in Kenneth Standley LP's transferred. Kenneth responded, "Ok. He will
be contacted." [26]

47.    On May 23, 2019, at 9:58 A.M. (CST), Jason asked Kenneth about the status of
discussions with BTH. Kenneth responded: "Exploring my options. may sign as
guarantor." Jason then replied that he guessed "we need to ask Jay [their family
attorney] what exposure you [sic]". This exposure is a reference to potential
guarantor liability of Kenneth. Jason speculated that such potential guarantor
liability of Kenneth would be equivalent to whatever liability Kenneth had at the

---

[24]  Ex. AI, Standley 000047.

[25]  *Id.*, Standley 000048.

[26]  *Id.*, Standley 000049.

time to Texas Capital Bank. [27] The speculation was inaccurate, as it assumed the loans and loan balances would be equivalent. Neither were equivalent because the BTH loans were structured differently and carried more risk for guarantors.

48.     On May 23, 2019, at 5:24 PM (CST), Kenneth texted Jason as follows: "Upon receiving the documents and reviewing them with legal counsel, if the terms are agreeable, I will sign as guarantor." This text meant that once Kenneth received and reviewed the proposed BTH loan documents, *and if they were acceptable to Kenneth*, then *Kenneth* was willing to sign as a guarantor. Kenneth was not giving Jason his consent to sign any documents on his behalf.[28] Kenneth had not yet received any loan documents from BTH to review because they were not yet finished being drafted.

49.     On May 30, 2019, at 3:17 P.M. (CST), Kenneth texted Jason and asked for a financial statement form from BTH. Jason replied, "I'll have him send one."[29] The "him" is Jim Bloodgood. At 3:50 P.M. (CST), Jason emailed Kenneth and Jim Bloodgood to ask Mr. Bloodgood to send Kenneth "one of your sheets to fill out for his PFS."[30] At 6:30 P.M. (CST), Jason forwarded Kenneth a "Personal Financial Statement Interactive BTH Bank.pdf." [31] Kenneth forwarded the attached document to Renee at 9:26 P.M. (CST) that night. [32]

50.     Renee testified that she helped Kenneth fill out the financial statement for BTH. She filled it out in her handwriting using his information, but it is Kenneth's signature at the bottom.[33] The financial statement is dated May 31, 2019. On Schedule 9 – Contingent Liabilities, Kenneth listed his guaranty of the loan at Texas Capital Bank. As explanation he states: "I assume that BTH Bank will be paying off the TCB line of credit note upon approval."[34] Kenneth testified

---

[27] *Id.*, Standley 000050.

[28] *Id.*, Standley 000054.

[29] *Id.*, Standley 000057.

[30] Ex. AE.

[31] Ex. AF.

[32] *Id.*

[33] Ex. AH.

[34] *Id.*

NextGear was not included on this financial statement because he did not personally guarantee payment of P.M. Standley's NextGear loan.  No such guaranty was admitted into evidence.[35]

51.     Jason admitted telephone records from AT&T.[36]  The "Conn. Date" is the connection date, the date of the call.[37]  The "Conn. Time" is the time the call was connected.[38]  The times listed are in UTC and expressed in military time as HH:MM:SS.[39]  UTC is Universal Time Coordinated which replaced Greenwich Mean Time (GMT).  "ET" means the elapsed time, or duration, of the call.[40]  In these records, Kenneth's number is the one ending in x7841.  Jason's number is the one ending x2899.

52.     On June 10, 2019, at 1:30 P.M. (CST), Kenneth texted Jason that "I'm going out of the country Wednesday the 12th until the 27th."[41]  Renee and Kenneth testified they were traveling to Germany to visit Jordan, their son, for two weeks.

53.     On June 10, 2019, Jason called Kenneth several times.[42]

54.     On June 11, 2019, at 16:27:22 (UTC), a telephone call lasting almost five minutes was made by Jason to Kenneth.  Jason testified Kenneth gave him verbal authorization to sign the BTH documents for Kenneth during this telephone call, the day before Kenneth left for Germany. The Court does not find this credible.

55.     On June 11, 2019, at 10:30 A.M. (CST), Jason texted Kenneth "Also, Jim said we can email docs back and forth for you to sign. He said the actual docs won't be

---

[35] Ex. AU.

[36] Ex. AC.  Ex. AD is a more useful excerpt of Ex. AC.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] Ex. AI, Standley 000061.

[42] Ex. AD, Pg. 289-290.

ready till later this week."[43]  Jason goes on to say "I guess I can get Noreen to notarize for you even though your [sic] not here. I can email the docs and you can sign and email them back to her to notarize. Then we can do actual wet ink copies when you get back."[44]  At 10:47 P.M. (CST), Kenneth asked Jason to resend those documents because his phone erased them.[45]  Kenneth had not yet traveled to Germany.  This text indicates to the Court Kenneth needed to review the proposed draft BTH loan documents.

56.  On June 12, 2019, Kenneth and Renee were leaving to travel to Germany.  At 8:52 A.M. (CST), Jason texted Kenneth that "I re emailed the contact [sic] to you" and Kenneth responded, "Got it."[46] On June 12, 2019, at 8:52 A.M. (CST), Jason forwarded an email to Kenneth which Mr. Bloodgood originally sent to Jason on Friday, June 7, 2019, at 11:56 A.M. (CST) with three attachments: The P.M. Standley Corporation Proposal.doc, Borrowing Base Form (P.M. Standley $8.5 million 5.20.19).xlsx, and Borrowing Base Form (P.M. Standley $1.5 million 5.1.19).xlsx.[47]  Mr. Bloodgood refers to these as a commitment letter and two credit facilities.

57.  Kenneth forwarded Jason's email to Renee a few minutes later at 9:21 AM (CST) on June 12, 2019.[48]  Kenneth recalled he and Renee were, by then, on their way to the airport.  Renee testified their flight to Germany left at noon on June 12, 2019, and they needed to be at the airport sometime around 9:00 A.M. Kenneth and Renee did not have access to a laptop or printer because they were traveling.

58.  Jason testified he thought the BTH loans needed to be signed by noon (CST) on June 19, 2019.  The BTH loan commitment contained a later expiration date of July 15, 2019 for the BTH loan terms to be accepted and the loans closed.[49]  Jason

---

[43]  Ex. AI, Standley 000062.

[44]  *Id.* Standley 000063.

[45]  *Id.*

[46]  *Id*.

[47]  Ex. AK.

[48]  *Id*.

[49]  *Id.*

testified he could not wait for the BTH loans to close because Texas Capital Bank's loan had already come due in May, 2019.

59.   On June 19, 2019, there were numerous calls between Jason and Kenneth.[50] Kenneth testified that in these phone calls, he expressed to Jason that he was not comfortable being a guarantor on the BTH loans.

60.   On June 19, 2019, at 9:00 AM (CST), Jason texted Kenneth, "I just sent the loan docs for signing. You, Paul Pogue, and Paul Noonan all need to sign and send back. We are going to transfer all inventory before noon this morning so I need all of these back signed from everyone within a couple of hours please."  He also texted "And nothing has to be notarized", "I've texted Paul Noonan to see if I can come to him for signing" and "I email them to him. Please let me know".[51]  Then the following text exchange took place, all shortly thereafter on June 19, 2019:

    a.  Kenneth: "Email it to me, and I couldn't get it back to you later this afternoon".[52]
    b.  Jason: "I did email it to you earlier".[53]
    c.  Kenneth: "That was from Paul a minute ago".[54]
    d.  Jason: "Ohh sorry".[55]
    e.  Kenneth: "I think he meant he could get it back today".[56]
    f.  Jason: "Ok."[57]

61.   Jason texted Paul Noonan at 9:07 AM (CST) on June 19, 2019, asking Mr. Noonan to give him a call because Jason had some documents for him to sign as trustee.[58]

---

[50]  Ex. AD, pgs. 304-06.

[51]  Ex. AI, Standley 000066.

[52]  *Id.*

[53]  *Id.*, Standley 000067.

[54]  *Id.*

[55]  *Id.*

[56]  *Id.*

[57]  *Id.*

[58]  Ex. 1, Standley 000283.

62.    Not until Renee and Kenneth landed in Germany could they use their son Jordan's
computer to review documents sent by Jason. When asked what stood out to her
about the BTH loan documents, Renee thought it strange that an inventory loan for
$8,500,000.00 did not specify that BTH would hold physical possession of vehicle
titles. She recognized this was different from how the NextGear loan was
structured.

63.    After reviewing the documents and discussing them with Kenneth, Renee advised
Kenneth not to agree to sign as a guarantor.

64.    Renee was present for a telephone conversation between Kenneth and Jason which
she said took place on June 19, 2019.  This was while she and Kenneth were in
Germany.  She remembered sitting on a red sofa at Jordan's home and that Jason's
portion of the conversation could be heard by speakerphone. She remembered
Kenneth telling Jason that he would not sign the BTH loan documents. She did not
print them for Kenneth, and according to her testimony Kenneth never signed
them.

65.    Kenneth and Jason continued texting on June 19, 2019, at 11:27 A.M. (CST) as
follows:

    a.  Kenneth: "How is it going"?[59]
    b.  Jason: "Haven't got anything back from Pogue and Noonan still
       hasn't called me back."[60]
    c.  Kenneth: "Did you e mail [sic] to Pogue???"[61]
    d.  Jason answers, "Yes.  Got Paul Noonan doing it now."[62]
    e.  Kenneth: "Pogue should get it back also."[63]
    f.  Jason: "Yep. We're all good now."[64]

---

[59] Ex. AI, Standley 000068.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

g. Kenneth: "you ok now"[65]
h. Jason: "Yes."[66]

66.     Jason testified that he signed all signatures on both original BTH loans for himself,
        Kenneth, Paul Pogue, and Paul Noonan.  These two loans were signed by Jason on
        June 19, 2019.  Kenneth and Renee were in Germany that day.  Jason was in
        Texas.  Paul Pogue was somewhere in South America.  Paul Noonan was in
        Texas.

67.     After Jason had signed the loan documents, he texted Paul Noonan on June 20,
        2019, at 12:08 P.M. (CST) to tell him that "Jay said that since the FLP doesn't
        exist any longer, you guys shouldn't need to sign. I got with BTH and I think they
        are correcting."[67]

68.     Some employees at P.M. Standley had signature stamps.  Kenneth and Renee both
        testified that it was not routine practice for people to sign another person's name,
        especially not for Jason to sign Kenneth's name.  Jason testified it was common
        practice for Noreen, a P.M. Standley employee, to sign checks without a stamp.

69.     Later in the evening of June 19, 2019, at 6:04 PM (CST), Kenneth and Jason
        texted again:

        a. Kenneth: "Paul text [sic] me for our attorney information. I gave him
           Jay's info. He was concerned about his liability. Did everything
           work out today as expected??"[68]
        b. Jason: "He has no liability. Have him call Jay. And which Paul?"[69]
        c. Kenneth: "I already told him that but when your worth probably 300
           million you don't do things without knowing. Still asking did
           everything get done today.  Obviously not Noonan."[70]

---

[65] *Id.*

[66] *Id.*

[67] Ex. 1, Standley 000283.

[68] Ex. AI, Standley 000069.

[69] *Id.*

[70] *Id.*

  d.   Kenneth: "Paul Pougue doesn't really need to call Jay. He doesn't have any real skin in the game he is only doing this because of me. I'm sure it makes the bank feel better with a trustee of his worth and character to be representing PMS and also a banker."[71]

  e.   Jason: "It doesn't hurt." [72]

70.    The next day, on June 20, 2019, at 1:42 P.M. (CST), Kenneth and Jason continued texting:

  a.   Kenneth: "Is everything done at the bank? Did Texas Capital get paid off or shortly ??"[73]

  b.   Jason: "After Jay went over the docs, he said we didn't need the trustees since the Family Living Partnership FLP was disbanded when we got Jordan's paid. So everything is paid off now at TCB and NextGear and transferred over."[74]

  c.   Kenneth: "As far as I am aware, the FLP was not dissolved @ that time or terminated; Jordan's was just separated from the FLP and his shares re-allocated to the remaining beneficiaries according to their percentage of ownership. I am glad that NexGear is paid off and you are done with TCB; hopefully, BTH will be easier to deal with, the fees will be lower and the retained earnings will start to accrue again which is what every bank looks at."[75]

  d.   Jason: "Maybe I'm saying it wrong but that's correct. Just broken up into 3 trusts.  And yes …they will be much easier to deal with …and much cheaper".[76]

71.    On June 20, 2019, Jason corresponded by email to send the BTH documents to Paul Pogue.[77]  At 8:09 P.M. (CST), he wrote to Mr. Pogue: "Don't waste any time

---

[71] *Id.,* Standley 000070.

[72] *Id.*

[73] *Id.,* Standley 000072.

[74] *Id.*

[75] *Id.,* Standley 000073.

[76] *Id.*

[77] Ex. 19.

on it as the trusts should never had been included in the deal and we will be reworking the contracts a different way. Thanks so much and sorry for the confusion."[78]

72.   Renee and Kenneth returned home from Germany on June 27, 2019.  By then, the BTH loans had closed.  On January 10, 2020, P.M. Standley obtained a new loan for the principal amount of $500,000.00 from BTH.  This third loan was a revolving line of credit.  P.M. Standley was the Borrower.  Unlimited guarantors were listed as Jason, Kenneth, and "Jason Standley Trust." Paul Pogue and Paul Noonan served as trustees for the Jason Standley Trust.  Jason signed on behalf of P.M. Standley as President.  According to the corresponding security agreement, this third BTH loan was secured by the inventory of P.M. Standley.  This third loan had a quick maturity, and was renewed four times, with a final maturity date of December 29, 2020. [79]

73.   Paul Pogue, and Paul Noonan did not sign loan documents related to the third BTH loan for $500,000.00.  Jason testified that he signed their names in addition to his own.  Jason testified he also signed Kenneth's name to his unlimited guaranty of this third BTH loan.  Multiple signatures were required.  Jason testified he relied on his father's verbal authorization to sign his name to these loan documents, an assertion of dubious credibility.

*Renewing the BTH Bank, N.A. Loans*

74.   Shortly after the first renewal of the third BTH loan, the two prior BTH loans made to P.M. Standley were renewed.

75.   On April 24, 2020, P.M. Standley BTH renewed Loan No. xxx3807 for $1,500,000.00 with a new maturity date of May 1, 2021.  This renewal listed the Jason Standley Trust, Jason, and Kenneth as guarantors.[80]

---

[78] *Id.*

[79] Ex. 29.

[80] Ex. 36.

76.  On April 24, 2020, P.M. Standley and BTH renewed Loan No. xxx3815 for $8,500,000.00 with a new maturity date of May 1, 2021.  This renewal listed the Jason Standley Trust, Jason, and Kenneth as guarantors.[81]

77.  The Kenneth Standley Trust was not listed as a guarantor in these renewal loans.[82] The trustees of the Kenneth Standley Trust and the Jason Standley Trust appear to be the same, Paul Pogue and Paul Noonan.  Jason signed these trustees' names to the renewal loan documents.

78.  Kenneth testified he did not sign the renewals of the first two BTH loans. According to Kenneth's testimony, which the Court found credible, he was unaware he personally was a guarantor on the BTH loans until he received a default notice in the mail.  When asked about this notice, Jason told him "You can trash it. It's being computer generated. I'll remind Jim again to have it corrected."[83]

79.  Instead, these renewal loan documents were signed by Jason.  Multiple signatures were required.  Jason testified he still relied on his father's verbal authorization to sign his name to these renewal loan documents.  The Court heard little, if any, evidence, that Jason had the authorization of Paul Pogue or Paul Noonan in their respective capacities as fiduciaries to sign any of these documents on their behalf. Jason's testimony about having continued authority to sign these loan renewals was not credible.

80.  The Court finds Kenneth's testimony to be credible that he did not sign the BTH renewal loan documents.  No handwriting expert evidence was admitted comparing Kenneth's signature on his financial statement to his purported signatures on the BTH loan documents.[84]  However, both Kenneth and Renee credibly testified that it is Renee's handwriting in the body of his BTH financial statement, but his signature on the bottom of the first page of the statement.[85]

*Jason's "Account Receivable" and the Closure of P.M. Standley*

---

[81]  Ex. 37.

[82]  Exs. 8, 9, 36, and 37.

[83]  Ex. 87.

[84]  *See* Exs. AH, 8, 9, 36, and 37.

[85]  Ex. AH.

81.   Jason and Shannon bought their home located at 11600 Ranch Rd., Copper Canyon, TX 76226 on January 30, 2019.

82.   At some point Jason and Shannon sold their prior home located in Plano, Texas. Jason stated that net proceeds from this sale were paid to P.M. Standley to reduce the balance of his account receivable.

83.   After Jason and Shannon purchased their new home on Ranch Rd., they bought two acres next to this property which increased their entire homestead to approximately ten acres.  P.M. Standley paid for this two-acre purchase.

84.   Jason and Shannon spent significant money performing work on their Ranch Rd. homestead.  Jason characterized much of the approximately $1 million in expenditures as repairs, such as fencing and repainting the outside of the home, storm damage repairs, and damage caused by a snowstorm necessitating replacement of floors and the roof.[86]  However, the Court finds many others to instead be unnecessary improvements, such as the addition of a sports court,[87] lawn turf,[88] putting green,[89] and outdoor kitchen.[90]

85.   Jason testified that on the petition date he believed that a value of $1,200,000.00 to be a fair value for the Ranch Rd. property, calculated by his overall value estimate of $1,800,00.00 less $800,000.00 in allegedly needed repairs.  Later, after completion of these repairs, the Ranch Rd. home was sold for signification more.

86.   From September 12, 2019, through August 13, 2020, invoices for work performed on the Ranch Rd. property admitted into evidence total $711,748.59.[91]

87.   Zeke Najera was the general contractor for these home repairs and was paid directly for at least some of this work from a Frost bank account owned by Jason and Shannon.[92]  Jason, however, testified that P.M. Standley paid for much of this

---

[86]  Exs. 67 and 68.

[87]  Ex. 105, pg. Standley 1607.

[88]  Ex. 25.

[89]  *Id.*

[90]  Ex. 105, pg. Standley 1561.

[91]  Ex. 105.  One invoice of $1,550.00 appears to relate to a different job for Preston and is not included in this total.  *Id.* at Standley 1708.

[92]  Ex. 94.

work which was added to his account receivable.  He stated these amounts were repaid to P.M. Standley.  Jason testified Mr. Najera requested, and Jason complied, to be paid by check in amounts less than $10,000.00 to accelerate the availability of funds after deposit.

88.   Jason testified that P.M. Standley paid $65,000.00 to purchase three horses for Jason and Shannon.  According to his testimony, the barn at the Ranch Rd. property was not ready to properly house these horses when they were purchased.  As a result, the purchase price included amounts for boarding, veterinary care, and training.  One of these horses was gifted to Jason and Shannon's son, Preston.

89.   Jason did not review P.M. Standley's account statements from its accounts at BTH Bank.  Instead, he monitored P.M. Standley's business performance by reviewing profit and loss statements generated by computer.

90.   Kenneth testified that when he was running P.M. Standley's operations, employees with an account receivable used them mainly for business development purposes such as lunches or events for local car salesmen.  Renee testified that some personal purchases would be made, but she required these to be repaid.

91.   Significant sums of money flowed between P.M. Standley and Jason and Shannon's Frost bank account.  Jason testified these were transactions where he borrowed and would repay funds from P.M. Standley on his account receivable.  Using this account receivable, P.M. Standley regularly paid personal expenses of Jason.  No evidence was admitted of a lien of P.M. Standley against any property of Jason or Shannon in connection with this account receivable.

92.   Jason made a payment of $58,912.64 by check dated November 8, 2019, from he and Shannon's Frost Bank account to P.M. Standley against his account receivable.[93]

93.   On December 16, 2019, Jason and Shannon's statement balance in their Frost Bank account was $2,820.14. [94]

94.   Jason and Shannon did not keep a systematic record of income or purchases other than the Frost Bank statements.

---

[93] *Id.,* Standley 000175.

[94] *Id.,* Standley 000177.

95.     On February 18, 2020, P.M. Standley electronically deposited $18,570.25 into Jason and Shannon's account.[95]

96.     On March 16, 2019, Jason and Shannon's statement balance in their Frost Bank account was $546.59.  Deposits totaled $191,905.91.  Withdrawals totaled $202,002.39. [96]  Checks to P.M. Standley reflected in the March statement total $165,977.36.[97]  These checks were all dated early March, 2020.

97.     In April 2020, deposits totaled $63,809.95, withdrawals totaled $63,409.55, and the ending balance was $946.99.[98]  Checks to P.M. Standley are reflected in the April statement.  This is the month in which the BTH loans were renewed.

98.     In May 2020, deposits totaled $204,716.10, withdrawals totaled $200,558.38, and the ending balance was $5,104.71.[99]  Checks to P.M. Standley are reflected in the May statement.

99.     In June 2020, deposits totaled $187,714.83, withdrawals totaled $183,526.69, and the ending balance was $9,292.85. [100]  Checks to P.M. Standley are reflected in the June statement, including one dated May 21, 2025, for $150,000.00.

100.    Amounts in July 2020, were smaller.  Deposits totaled $36,108.09, withdrawals totaled $39,413.18, and the ending balance was $5,987,76. [101]  Checks to P.M. Standley are reflected in the July statement totaling $6,200.00.

101.    In August 2020, deposits totaled $81,818.21, withdrawals totaled $80,382.35, and the ending balance was $7,423.62. [102]  Checks to P.M. Standley total $6,200.00.

---

[95]  *Id.,* Standley 000185.

[96]  *Id.,* Standley 000191.

[97]  *Id.,* Standley 000195.

[98]  *Id.,* Standley 000197.

[99]  *Id.,* Standley 000203.

[100]  *Id.,* Standley 000209.

[101]  *Id.,* Standley 000215.

[102]  *Id.,* Standley 000221.

102.  In September 2020, deposits totaled $211,948.50, withdrawals totaled
      $208,406.97, and the ending balance was $10,965.19. [103]

103.  In October 2020, deposits totaled $610,547.83 and withdrawals totaled
      $609,064.02.[104]  All checks that month were paid out to P.M. Standley.[105]

104.  The amounts reflected in November 2020, are large.  Deposits totaled
      $1,532,789.03 and withdrawals totaled $1,484,934.81.[106]  The ending balance was
      $60,303.22.  Jason wrote 33 checks to P.M. Standley and 5 checks to Zeke
      Najera.[107]

105.  December 2020, amounts were even larger.  Deposits totaled $4,948,042.03 and
      withdrawals totaled $4,988,253.25.[108]  The beginning balance was $60,303.22 and
      the ending balance was $20,092.00.[109]  This is the month that the third BTH loan
      originally for $500,000.00 matured.

106.  No ledger for Jason's account receivable at P.M. Standley was admitted into
      evidence to reflect the source of the listed "teller deposits" or "deposits." Some
      deposits were made electronically by P.M. Standley.

107.  In January 2021, deposits totaled $4,560,586.06 and withdrawals totaled
      $4,562,767.34.[110]  The ending balance was $17,910.72.  Different from the pattern
      of prior months was an electronic deposit for $811,000.00 from a different Frost

---

[103]  *Id.,* Standley 000227.

[104]  *Id.,* Standley 000233.

[105]  *Id.,* Standley 000237 and 000238.

[106]  *Id.,* Standley 000239.

[107]  *Id.,* Standley 000243-245.

[108]  *Id.,* Standley 000247.

[109]  *Id.*

[110]  *Id.,* Standley 000259.

bank account.[111]  The checks paid out to P.M. Standley on this statement were actually paid the last half of December 2020.[112]

108.  Jason testified that during the last couple of months in 2020, P.M. Standley had several very large vehicle auctions for P.M. Standley resulting in an influx of cash, but without a corresponding replacement of inventory because of overhead.

109.  Kenneth and Jason's testimony disagreed over whether accounts receivable transactions of this quantity and amount were customary for P.M. Standley. Kenneth testified they were not, while Jason testified these transactions were acceptable because he repaid P.M. Standley.  The most credible witness on this point was Renee, for whom such large and frequent transactions would not in her experience have been the norm.  Rather, she testified that the highest balance of an account receivable she could remember was approximately $15,000.00 to $20,000.00.

110.  In February 2021, deposits totaled $65,363.53 and withdrawals $77,714.96.  The ending balance was down to $5,559.29.[113]

111.  P.M. Standley closed for business in February 2021.

112.  Finally, in March 2021, deposits totaled $96,360.92 and withdrawals totaled $81,682.21.[114]  The ending balance was $20,238.00.  Of these deposits, $87,836.00 was an IRS tax refund.  There were no deposits from nor checks to P.M. Standley.

113.  The Frost Bank account was closed in March 2021.

*BTH Bank, N.A. Suit and Receiver Appointment*

114.  BTH sued P.M. Standley Corporation in Cause No. DC-21-01794, styled *BTH Bank, National Association v. The P.M. Standley Corporation*, before the 193rd Judicial District Court of Dallas County, Texas.  In this case on February 12, 2021,

---

[111]  *Id.*

[112]  *Id.*

[113]  *Id.,* Standley 000269.

[114]  *Id.,* Standley 000275.

Jason agreed for P.M. Standley to the appointment of a receiver over the assets of P.M. Standley.[115]

115. On April 13, 2021, Thomas D. McClintock, as court appointed receiver, filed an inventory of P.M. Standley's assets with the state court list.  This inventory identified nine motor vehicles, and eight other assorted items.[116]  Previously, P.M. Standley had sold as many as 250 cars *per month*.

116. After being appointed, the receiver closed P.M. Standley in late February 2021, and took control of its property and business location.  Jason testified that he was owed money by P.M. Standley when it closed, but the Court found little evidentiary basis for this other than his testimony.

117. After closure of P.M. Standley, Jason was unemployed.

118. Jason and Shannon opened new checking account x3159 at Capital One on March 9, 2021.[117]  The first deposit was made on March 11, 2021 in the amount of $25,000.00.  Another deposit of $40,000.00 was made on March 12, 2021.  A third of $15,000.00 was made on March 18, 2021.  A check in the amount of $44,330.60 was deposited on March 24, 2025.  Jason and Shannon opened a second new checking account x6475 on March 31, 2021 and transferred $50,000.00 into this new account from account x3159.

119. The ending balance in Capital One checking account x3159 for the month of March, 2021 was $71,582.17.[118]

120. Statements for these two new Capital One checking accounts from March, 2021 through June, 2022 reflect Jason and Shannon's financial activity after P.M. Standley was closed and prior to their filing bankruptcy.[119]  This activity included, during the first two months these accounts were open, by way of example only:

      a.  4/16/2021 - Cash Withdrawal - $22,175.30 – x3159
      b.  4/30/2021 - ATM Withdrawal - $800.00 – x3159

---

[115] Ex. K.

[116] Ex. L-1.

[117] Ex. BC and Ex. 95.

[118] Ex. BC.

[119] Ex. 95.

    c.  4/30/2021 - ATM Withdrawal - $800.00 – x3159
    d.  4/30/2021 - ATM Withdrawal - $1,003.00 – x3159
    e.  4/30/2021 - ATM Withdrawal - $1,003.00 – x3159
    f.  4/30/2021 - ATM Withdrawal - $163.00 – x3159
    g.  4/30/2021 - ATM Withdrawal - $800.00 – x6475
    h.  4/30/2021 - ATM Withdrawal - $1,003.00 – x6475
    i.  4/30/2021 - ATM Withdrawal - $383.00 – x6475
    j.  5/4/2021 - Withdrawal NEWREZ-SHELLPOI ACH - $6,520.23 – x3159
    k.  5/7/2021 - ATM Withdrawal - $1,003.00 – x3159
    l.  5/7/2021 - ATM Withdrawal - $903.00 – x3159
    m.  5/7/2021 - ATM Withdrawal - $800.00 – x3159
    n.  5/8/2021 - ATM Withdrawal - $800.00 – x3159
    o.  5/10/2021 – Check 301 - $6,000.00 – x3159
    p.  5/10/2021 – Check 303 - $8,514.21 – x3159
    q.  5/31/2021 - ATM Withdrawal - $1,003.00 – x3159

121.    Jason and Shannon opened a third checking account at Capital One ending x2983 on March 23, 2022. [120]  The first deposit into this account was made April 6, 2022, in the amount of $4,209.24.  The April statement lists these funds as insurance proceeds from USAA for hail damage.  The following month on May 24, 2022, a check for $25,368.19 described as a "Partial Allstate Payment" was deposited.

122.    On June 1, 2022, $29,500.00 in cash was withdrawn from the Capital One x2983 account in person at a branch, leaving a closing balance of $78.56 on June 30, 2022.

123.    In his testimony, Jason could not recall the source of many of the deposits into these Capital One accounts.  However, he testified that during the time between the closure of P.M. Standley and the bankruptcy filing, his sons Preston and Aaron were still in the business of buying and reselling cars and as a result needed some cash on hand.  Further, at some point Preston sold his separate home and moved into the Ranch Rd. property with Jason and Shannon.  According to Jason, Preston helped pay family expenses, which was very important for the first few months after P.M. Standley closed.

124.    On June 28, 2021, BTH filed a second suit against Kenneth Standley, Paul Noonan, in his capacity as Co-Trustee of the Jason Standley Trust, and Paul Pogue, in his capacity as Co-Trustee of the Jason Standley Trust.  This second suit

---

[120] *Id.*

is Cause No. 380-03430-2021 in the 380th Judicial District of Collin County, Texas. [121]   Kenneth, Paul Pogue, and Paul Noonan added third party claims against Jason on September 9, 2021.[122]

125.   Kenneth testified that the first time he saw his signature on BTH loan documents was when BTH filed suit against him.

*The Bankruptcy Case*

126.   Before a deposition in the preceding state court litigation, Jason and Shannon filed their voluntary petition for Chapter 7 bankruptcy on June 2, 2022 in the Eastern District of Texas, Sherman Division, Chief Judge Rhoades presiding.[123]

127.   Mark A. Weisbart (the "Trustee") was assigned as the Chapter 7 Trustee on June 2, 2022.[124]

128.   Jason and Shannon filed their Original Schedules, Chapter 7 Statement of Current Monthly Income Form 122A-1, and Statement of Financial Affairs on June 16, 2022.[125]

129.   In their Original Schedules, Jason and Shannon listed the value of the Ranch Rd. home at $1,254,849.00.[126]   Scheduled jewelry was valued at $300.00, and two fourteen-year-old horses at $10,000.[127]   The three Capital One accounts ending x3159, x2983, and x6475 were scheduled, as well as Shannon's mother's Chase account on which Shannon was an authorized signer.   Claims in unknown amounts against BTH, Thomas Clintock the receiver, the Jason Standley Trust, Renee Standley, Paul Pogue, Paul Noonan, and P.M. Standley were also scheduled.

---

[121] Ex. 61.

[122] Ex. I, ECF No. 1 as attached to Pl. Orig. Compl.

[123] Case No. 22-40689, ECF No. 1.

[124] Case No. 22-40689, ECF No. 2.

[125] Case No. 22-40689, ECF No. 15.

[126]  Ex. C.

[127]  *Id.*

130.  The 341 Meeting of Creditors was held on July 8, 2022, and continued to September 16, 2022.

131.  This Adversary was filed on September 5, 2022.[128]  The deadline to object to discharge or dischargeability was September 6, 2022.  Kenneth's Original Complaint asserted causes of action against Jason and Shannon Standley under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), 523(a)(6), and 727(a)(4)(A).[129]

132.  The 341 Meeting of Creditors was held on September 16, 2022, and continued to October 21, 2022.

133.  The 341 Meeting of Creditors was held and concluded on October 21, 2022.

134.  Amended Schedules A/B, C, D, E/F, and G were filed on November 7, 2022,[130] as was an Amended Statement of Financial Affairs,[131] and an Amended Statement of Intent.[132]

135.  Kenneth Standley filed Proof of Claim No. 3 for $10,200,000.00 on November 11, 2022.[133]

136.  BTH filed Proof of Claim No. 5 for $12,496,952.10 on November 30, 2022.[134]

137.  In its *Order Granting In Part and Denying In Part Defendants' Motion to Dismiss Adversary Proceeding*, the Court dismissed Kenneth's causes of action against Shannon under §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), and 523(a)(6).  These causes of action survived as to Jason, and Kenneth's cause of action under § 727(a)(4)(A) survived as to both Jason and Shannon.[135]

---

[128]  ECF No. 1.

[129]  *Id.*

[130]  Case No. 22-40689, ECF No. 42.

[131]  Case No. 22-40689, ECF No. 43.

[132]  Case No. 22-40689, ECF No. 44.

[133]  Ex. G.

[134]  *Id.*

[135]  ECF No. 10.

138.   Both parties filed summary judgment motions and corresponding responses.[136]

139.   Kenneth voluntarily dismissed his § 523(a)(4) cause of action for breach of fiduciary duty against Jason.[137]

140.   The Court denied Defendants, Jason and Shannon's summary judgment motion as set forth in its *Order Denying Defendants' Amended Motion for Partial Summary Judgment*.[138]

141.   The Court denied Plaintiff, Kenneth's summary judgment motion in its *Order Denying Plaintiff's Motion for Summary Judgment*.[139]

## II.  Conclusions of Law

1.   The Court has jurisdiction to consider the adversary complaint in this proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2.   This Court has authority to enter a final judgment on all issues raised in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (I), and (J) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.   All exceptions to discharge under 11 U.S.C. § 523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio* (*In re Hudson*), 107 F.3d 355, 356 (5th Cir. 1997).  The Fifth Circuit, however, has ruled that there are limits to this assumption, particularly in reference to the exceptions under 11 U.S.C. § 523 in which the debtor has allegedly committed fraud. *Tummel v. Quinlivan* (*In re Quinlivan*), 434 F.3d 314, 318-319 (5th Cir. 2005).  Consequently, courts must balance a debtor's "fresh start" against protecting the victims of fraud. *Id.* at 319.

4.   A preponderance of the evidence standard applies to the determination of the dischargeability of a particular debt under § 523. *See Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).

---

[136]  ECF Nos. 70, 71, 72, 74, 79, 82, 85, 86, 89.

[137]  ECF No. 81.

[138]  ECF No. 90.

[139]  ECF No. 91.

5.      The Bankruptcy Code requires that a debtor be granted a discharge unless one of
        the statutory grounds for denial of that discharge is proven.  *See* 11 U.S.C. §
        727(a).

6.      The denial of a debtor's discharge is considered an extreme remedy.  *See Pher
        Partners v. Womble* (*In re Womble*), 289 B.R. 836, 845 (Bankr. N.D. Tex. 2003)
        (citing *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)).

7.      "Courts should deny discharge only for very specific and serious infractions."
        *Martin Marietta Matl's Southwest, Inc. v. Lee* (*In re Lee*), 309 B.R. 468, 476
        (Bankr. W.D. Tex. 2004) (citing *Ichinose v. Homer Nat'l Bank* (*In re Ichinose*),
        946 F.2d 1169, 1172 (5th Cir. 1991)).

8.      A denial of discharge is to be imposed only upon those debtors who have not been
        honest and forthcoming about their affairs and therefore have not fulfilled the
        duties of full disclosure required of a bankruptcy debtor.  *Buckeye Retirement
        Properties v. Tauber* (*In re Tauber*), 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006)
        ["The denial of a debtor's discharge is akin to financial capital punishment. It is
        reserved for the most egregious misconduct by a debtor."].

9.      Thus, speculation and surmise about the existence of such misconduct are
        insufficient.  Probative evidence must be presented.

10.     To fulfill the statutory policy of providing a debtor with a "fresh start," the
        provisions of § 727(a) are construed strictly against parties seeking to deny the
        granting of a debtor's discharge and liberally in favor of a debtor.  *Laughlin v.
        Nouveau Body & Tan, L.L.C.* (*In re Laughlin*), 602 F.3d 417, 421 (5th Cir. 2010);
        *Benchmark Bank v. Crumley* (*In re Crumley*), 428 B.R. 349, 356 (Bankr. N.D. Tex.
        2010); *First United Bank & Trust, Co. v. Buescher* (*In re Buescher*), 491 B.R. 419,
        431 (Bankr. E.D. Tex. 2013) (citing *Ichinose v. Homer Nat'l Bank (Matter of
        Ichinose)*, 946 F.2d 1169, 1172 (5th Cir. 1991)).

11.     The same construction principles favoring a debtor are imposed in an action to
        determine the dischargeability of a particular debt.  *See FNFS, Ltd. v. Harwood* (*In
        re Harwood*), 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio &
        Raggio, Inc.* (*In re Hudson*), 107 F.3d 355, 356 (5th Cir. 1997)); *Lawrence v. Frost
        Bank* (*In re Lawrence*), No. 21-10103, 2022 U.S. App. LEXIS 886, 2022 WL
        118966, at *1 (5th Cir. Jan. 12, 2022).

12.     However, "a debtor has no constitutional or fundamental right to a discharge,"
        because the "Code limits the opportunity for a completely unencumbered new

beginning to the honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

13.    The Plaintiff bears the burden of proving that the Debtor-Defendant is not entitled to a discharge under § 727. The standard of proof for its claim is a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009); *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).

## 11 U.S.C. § 523(a)(2)(A)

14.    11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, ... to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

15.    Section 523(a)(2)(A) encompasses similar but distinct causes of action. The Fifth Circuit has distinguished the elements of "actual fraud" from those involving "false pretenses and false representations." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995) (overruled on other grounds by *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016)).[140] The Supreme Court also views these as distinct causes of action. *Husky*, 578 U.S. at 355 (stating Congress "did not intend 'actual fraud' to mean the same thing as 'false representations.'"); *see*

---

[140] The effect of *Husky* can be explained as follows:

On May 16, 2016, the United States Supreme Court issued Husky Int'l Electronics, Inc. v. Ritz, [578] U.S. [355], 136 S.Ct. 1581, 194 L. Ed. 2d 655 (2016) in which it clarified the standards for actual fraud. In *Husky*, the debtor transferred large sums of Chrysalis Manufacturing Corporation's money to other entities he controlled. A creditor of Chrysalis Manufacturing Corporation argued that these inter-company transfers constituted actual fraud under § 523(a)(2)(A). The Supreme Court agreed and held that actual fraud under § 523(a)(2)(A), "encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky*, 136 S.Ct. at 1586. "To the extent that *In re Acosta, RecoverEdge*, and other prior Fifth Circuit cases required that a debtor make a representation in order for a debt to be nondischargeable under § 523(a)(2)(A), those cases are effectively overruled by the Supreme Court's decision in this case. *Husky*, 136 S.Ct. at 1586."

*In re Pellerin*, Nos. 1100857EE, 1100121EE, 2017 Bankr. LEXIS 655, at *23-24 (Bankr. S.D. Miss. 2017).

*also Choi v. Tan*, No. 4:24-CV-342, 2025 U.S. Dist. LEXIS 58243, at *14 (E.D. Tex. 2025).

16.    The distinction as recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event as opposed to a representation regarding a past or existing fact.  *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991) (overruled on other grounds by *Husky Intern. Electronics, Inc. v. Ritz*, 578 U.S. 355 (2016))[141] ["In order…to be a false representation or false pretense under 523(a)(2), the false representations and false pretenses [must] encompass statements that falsely purport to depict current or past facts.  [A debtor's] promise…related to [a] future action [which does] not purport to depict current or past fact…therefore cannot be defined as a false representation or a false pretense"].

17.    This means that "[a] debtor's representation related to a future action does not satisfy § 523(a)(2)(A) for a false pretense or false representation unless, at the time the representation was made, the creditor can establish that the debtor had no intention of fulfilling the promise or representation."  *In re Rosenburg*, No. 20-40753-MXM-7, 2022 WL 4085886, at *3 (Bankr. N.D. Tex. Sept. 6, 2022).

18.    Plaintiff, Kenneth, seeks to have a debt owed by Defendant, Jason, excepted from discharge pursuant to the "false pretenses" or "false representation" provision in § 523(a)(2)(A), and under the "actual fraud" provision in § 523(a)(2)(A).

19.    Defendants are opposed to such relief, stating they "object to any claimed causes of action that were not included in the Complaint.  Defendants assert that those causes of action, and any cause of action not included in the Complaint, are untimely, waived or barred by limitations and may not be prosecuted."[142]  Specifically, "Defendants object to any amendment of Plaintiff's Complaint to

---

[141]  As another bankruptcy court explained:

*Husky* made clear that no misrepresentation is necessary to establish an "actual fraud" under § 523(a)(2)(A) of the Bankruptcy Code. Courts in the Fifth Circuit continue to follow *Bercier's* requirement that a "false representation" under § 523(a)(2)(A) must relate to past or current facts. See, *e.g., In re Carter*, No. 17-35082, 2018 WL 6060391, at *23 (Bankr. S.D. Tex. Nov. 19, 2018); *In re Martin*, No. 15-41103, 2017 WL 1316928, at *10 (Bankr. E.D. Tex. Apr. 7, 2017).

[142]  Joint Pretrial Ord., 3, ECF No. 120.

now allege fraud under 523(a)(2)(A)." [143]  This argument is premised on Defendant's reading of Plaintiff's Complaint to only support a section 523(a)(2)(A) cause of action for false pretenses or representations.

20. "Bankruptcy courts should and do insist that the stringent standard imposed by Bankruptcy Rule 7009 be observed by parties claiming fraud, particularly if the party asserting fraud has firsthand knowledge of the fraudulent transaction." *Matter of Haber Oil Co., Inc.,* 12 F.3d 426, 439 (5th Cir. 1994).  "Cases suggest that courts should not find waiver of the procedural protections required in adversary proceedings unless the parties are apprised of and have a chance to address all the issues being decided." *Id*. at 440.

21. A bankruptcy court is generally confined to grant a plaintiff only the relief requested in the operative complaint, except where FED. R. CIV. P. 54(c) is applicable.[144]  FED. R. CIV. P. 54(c) provides:

> (c) Demand for Judgment; Relief to Be Granted. A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.

22. The Fifth Circuit has explained the operation of this rule as follows:

> Rule 54(c)'s remedial latitude is not unlimited. Although the rule authorizes relief beyond what a complaint specifically requests, the relief granted "must be based on what is alleged in the pleadings and justified by plaintiff's proof, which the opposing party has had an opportunity to challenge." *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 n.4 (5th Cir. 2015) (quoting 10 Charles Alan Wright, Arthur Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2662 (4th ed. 2014), at 165); *see also* 10 Moore's Fed. Prac., Civil § 54.72 (2024) (relief under Rule 54(c) "may not be granted . . . on an issue not properly presented to the court for resolution"). In other words,

---

[143] Joint Pretrial Ord., 6, ECF No. 120.

[144] FED. R. CIV. P. 54(c) is applicable to this proceeding pursuant to FED. R. BANKR. P. 7054(a).

31

> "[t]he discretion afforded by Rule 54(c) . . . assumes that a plaintiff's entitlement to relief not specifically pled has been tested adversarially, tried by consent, or at least developed with meaningful notice to the defendant." *Peterson*, 806 F.3d at 340.

*Deanda v. Becerra*, 96 F.4th 750, 768 (5th Cir. 2024).

23.    In another recent opinion, the Fifth Circuit reaffirmed its guidance on the operation of FED. R. CIV. P. 54(c):

> We continue to adhere to the view that Rule 54(c) offers "remedial latitude," insofar as judgments need not be limited to the kind or amount of relief pleaded, but we think it a step too far for the district court to award relief never pleaded (indeed, abandoned), and to do so at the last stage of proceedings and for particular agency actions never expressly challenged.

*Braidwood Mgmt. v. Becerra*, 104 F.4th 930, 953 (5th Cir. 2024).

24.    In practice then, Rule 54(c) means a bankruptcy court may grant relief not specifically requested in the operative complaint if that relief is justified by the pleadings, the evidence presented, and granting such relief does not prejudice the opposing party. As one court explained:

> Under Federal Rule of Civil Procedure 54(c), "district courts [may] grant any appropriate relief following a general prayer by the plaintiff, even if the plaintiff did not specifically seek it, but only where relief is otherwise legally permitted." *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 (5th Cir. 2015); see also *Sapp v. Renfroe*, 511 F.2d 172, 176 n.3 (5th Cir. 1975) (Rule 54(c) "has been construed liberally[.]"). "Rule 54(c) does not permit unrequested relief when it operates to the prejudice of the opposing party, such as when relief is finally sought at a late stage of the proceedings." *Portillo v. Cunningham*, 872 F.3d 728, 735 (5th Cir. 2017) (cleaned up); *see also id.* ("The discretion afforded by Rule 54(c) [] assumes that a plaintiff's entitlement to relief not specifically pled has been tested adversarially, tried by consent, or at least developed with meaningful notice to the defendant."). But when a district court permits the parties to "present[] . . . arguments" concerning the specific relief, and when a party "ha[s] every reason to expect that the court might" grant such relief, "there [is] no prejudice" under Rule 54(c). *Id.* at 735.

32

*Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 377-78 (N.D. Tex. 2021).

25.     In this proceeding, Defendants previously filed a "Motion to Dismiss."[145]
        Defendant, Jason Standley, sought dismissal of Plaintiff's claims under section
        523(a)(2)(A), including under the actual fraud component of that section.  After
        Plaintiff objected and having considered the parties arguments and positions, this
        Court issued its "Order Granting In Part and Denying In Part Defendants' Motion
        to Dismiss Adversary Proceeding" on November 28, 2022.[146]  In it, this Court
        wrote:

> In this case the Complaint satisfactorily sets forth the basis for the
> fraud claims asserted against Defendant, Jason Troy Standley, but not
> as to Defendant, Shannon Davina Standley. Plaintiff will be ultimately
> responsible for demonstrating he was the victim of fraudulent conduct
> of Defendant, Jason Troy Standley, at the time of the transactions
> alleged in order to render his particular debt nondischargeable.
> However, the application of Rule 9(b) is flexible, and the allegations
> are sufficient to allow composition of a response in defense.[147]

26.     Thus, Defendants were apprised of the scope of the § 523(a)(2)(A) fraud, false
        representations, and false pretenses causes of action early in the case, and the
        Court has already ruled that Plaintiff has met his pleading burden on these issues.

27.     Furthermore, the claims in this case were litigated over five days, during which the
        Court heard testimony from several witnesses and admitted numerous exhibits.
        Relief afforded under any of the three discrete parts of § 523(a)(2)(A) would be
        justified by the pleadings and evidence.  After such an extensive opportunity to
        oppose Plaintiff's causes of action, which he did, Defendant, Jason Standley, will
        not be prejudiced by the Court considering the merits of possible relief against him
        under the actual fraud component of § 523(a)(2)(A).

28.     Therefore, the Court will analyze all three categories listed in § 523(a)(2)(A): false
        pretenses, false representations, and actual fraud.

---

[145]  ECF No. 8.

[146]  ECF No. 10.

[147]  *Id*. at 8.

29.    Prior to considering this question, however, the Court must first consider whether
a debt even exists that may be held nondischargeable.  *Simmons v. Simmons* (*In re
Simmons*), Nos. 23-10130, 24-1006, 2025 Bankr. LEXIS 1382, at *21 (Bankr.
E.D. Tex. 2025).

30.    "A bankruptcy court cannot declare a debt nondischargeable until the creditor
establishes the existence and amount of that debt." *In re Avery*, 594 B.R. 655, 661
(Bankr. S.D. Miss. 2018); *see also In re Burg*, 641 B.R. 120, 131 (Bankr. S.D.
Tex. 2022).  As the Court in *Burg* explained, "debt" is a defined term meaning
"liability on a claim" and "claim" is a defined term meaning a "right to payment,
whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,
contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or
unsecured . . ." *In re Burg*, 641 B.R. at 131; 11 U.S.C. §§ 101(12) and 101(5).

31.    The Court finds Plaintiff has established that a debt exists which is owed to him by
Defendant.  This debt (referred to in these findings as "Kenneth's Guaranty
Liability to BTH") is comprised of any and all liability of Kenneth Standley to
BTH Bank, N.A., or its successors, under the guaranties signed in his name by
Jason Standley without authorization, or as may be adjudged or determined to be
owed to BTH Bank, N.A., or its successors, by Kenneth Standley in any state
court litigation pending by or between them, including but not limited to in Cause
No. 380-03430-2021 in the 380th Judicial District of Collin County, Texas, styled
*BTH Bank, N.A. v. Kenneth Standley, Paul Noonan in his capacity as Co-Trustee
of the Jason Standley Trust; and Paul Pogue, in his capacity as Co-Trustee of the
Jason Standley Trust*. This debt includes Kenneth's liability, if any, under:

    (1)    BTH Bank, NA Loan xxx3807 in the original principal amount of
$1,500,000.00 dated June 19, 2019 with The P.M. Standley Corporation
dba P.M. Standley Motor Cars as Borrower, allegedly guaranteed by
Kenneth Standley under a Commercial Guaranty for benefit of BTH Bank,
NA, including all renewals, extension, modifications, and related loan
documents;[148]

    (2)    BTH Bank, NA Loan xxx3815 in the original principal amount of
$8,500,000.00 dated January 19, 2019 with The P.M. Standley Corporation
dba P.M. Standley Motor Cars as Borrower, allegedly guaranteed by

---

[148] Ex. 8.

Kenneth Standley under a Commercial Guaranty for benefit of BTH Bank, NA, including all renewals, extension, modifications, and related loan documents;[149] and

(3) BTH Bank, NA Loan xxx6967 in the original principal amount of $500,000.00 dated January 10, 2020 with The P.M. Standley Corporation dba P.M. Standley Motor Cars as Borrower, allegedly guaranteed by Kenneth Standley under a Commercial Guaranty for benefit of BTH Bank, NA, including all renewals, extension, modifications, and related loan documents.[150]

*False Pretenses and False Representation*

32.  While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *See Walker v. Davis (In re Davis)*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003); *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 389 (Bankr. E.D. Tex. 2009).

33.  To succeed under § 523(a)(2)(A), the creditor must prove an intent to deceive. *See Friendly Fin. Service - Eastgate v. Dorsey (In re Dorsey)*, 505 F.3d 395, 399 (5th Cir. 2007).

34.  "To obtain a judgment that a debt is nondischargeable for false representations, the misrepresentations must have been: (1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party." *Jacobson v. Ormsby (In re Jacobson),* No. 06-51460, 2007 WL 2141961, at *2 (5th Cir. July 26, 2007); *In re Rifai*, 604 B.R. 277, 308 (Bankr. S.D. Tex. 2019).

35.  "To obtain a judgment that a debt is nondischargeable for false pretenses, the creditor must show that: (1) the debtor engaged in conduct 'wronging one in his property rights by dishonest methods or schemes [such as] deprivation of something of value by trick, deceit, chicane[ry] or overreaching;' (2) there was

---

[149] Ex.9.

[150] Ex. 29.

scienter or intent; (3) causation; and (4) damages." *In re Rifai*, 604 B.R. 277, 312 (Bankr. S.D. Tex. 2019) (quoting *Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 701-02 (Bankr. S.D.N.Y. 1998)).

36. "When deciding whether a creditor has satisfied the 'intent' prong of a 'false pretenses' dischargeability exception, the bankruptcy court must consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor, indicating an intent to deceive his creditor." *In re Hurst*, 337 B.R. 125, 133 (Bankr. N.D. Tex. 2005).

37. "Intent to deceive is present if a debtor intends or has reason to expect a creditor to act, or to refrain from action, in reliance upon the debtor's misrepresentation; a result is intended if a debtor either acts with desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct." *Id.*

38. A court may infer the requisite intent from a "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005); *see also In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994) (considering the totality of the circumstances to determine the debtor's intent).

39. The outcome of this case depends on whether Kenneth gave Jason permission to sign guaranties on his behalf.  The Court found Kenneth's testimony to be reliable on this issue.  Kenneth had a long history of running P.M. Standley and testified credibly about how he chose to operate its business.  Much of his testimony on these points was credibly corroborated by Renee.  Kenneth was worried about the Texas Capital loan because he had personally guaranteed its balance, and wanted to make sure his potential liability was paid off, which it was when Jason refinanced with BTH.  Why would he want to continue to be a guarantor on new debt to a new lender with whom he had no relationship, at a time when he had stepped back from operating the business of P.M. Standley?

40. Kenneth was not worried as much about liability to NextGear because he was not a personal guarantor on that debt, but also because NextGear held titles to all vehicles P.M. Standley held in inventory.  In Kenneth's opinion, the value of these vehicles was sufficient to fully satisfy the NextGear loan balance if necessary.

41. Comparatively, Jason's testimony about Kenneth's alleged verbal authorization to sign his name to the BTH guaranties does not add up.  Jason's characterization of his interactions and communications with Kenneth, resulting in the alleged verbal

36

authorization, was not credible.  A decision as momentous as deciding to guarantee ten million dollars of loans is one which the Court would expect Kenneth to remember.  Even if he remembers the details of a brief telephone conversation from six years ago, Jason's testimony that Kenneth gave him verbal authorization to sign the BTH guaranties was not credible.  This is especially convincing considering Jason's admission of forging other loan document signatures *for the same set of loans* without authorization.

42.    Jason was under significant pressure from Texas Capital Bank to refinance PM Standley's loan.  Jason believed the BTH loan terms would be superior for P.M. Standley.  Kenneth simply trusted, to his detriment as it turned out, that his son Jason's business decision to refinance P.M. Standley's loans with BTH was a good one.

43.    Jason knew he could not execute all the loan documents required by BTH on his own.  He also knew he did not have authorization to sign Kenneth's name to those documents, nor the authorization of Paul Pogue or Paul Noonan.  Jason admits he signed both Paul Pogue and Paul Noonan's signatures.  He also admits that he signed Kenneth's name to the documents, just that he did so with Kenneth's verbal authorization.  The Court does not find such verbal authorization to have existed.

44.    Jason knew what he was doing when he signed Kenneth's name to the BTH loan documents.  Namely, he misrepresented that he had authorization to execute the BTH loan documents and that those documents had, in fact, been properly executed.  BTH certainly relied on these signatures, and seeks to impose on Kenneth liability under loan guaranties which Kenneth did not sign.  This pattern continued in subsequent renewals of the BTH loans.  Jason understood the nature and operation of a guaranty—namely, that BTH could recover from Kenneth if P.M Standley, which Jason controlled, defaulted on the loans.

45.    Jason's actions directly caused Kenneth to be responsible for Kenneth's Guaranty Liability to BTH.  Jason's actions directly affect Kenneth personally.

46.    Unlike the NextGear loan, in which NextGear held physical possession of title to secure payments of its loan with P.M. Standley's vehicle inventory, the largest BTH loan did not require P.M. Standley to surrender physical possession of vehicle titles to BTH.  Instead, BTH Loan xxx3815, contained the following provisions, among others:

> (1) "Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect

and continue Lender's Security Interest in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender."

(2) "Borrower does now, and at all times hereafter shall, keep correct and accurate record of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Inventory, Borrower agrees to keep and maintain such records as lender may require, including without limitation information concerning Eligible Inventory and records itemizing and describing the kind, type, quality, and quantity of Inventory, Borrower's inventory costs and selling prices, and the daily withdrawals and additions to the Inventory."[151]

47.    Unlike with NextGear, P.M. Standley was not required to surrender possession of vehicle titles to BTH.  This meant vehicles could be sold without proceeds being paid to BTH, and that the risk of default or loan deficiency was greater.

48.    During the time when BTH was P.M. Standley's lender, Jason extensively used his "account receivable" to pay personal expenses.

49.    P.M. Standley defaulted on the BTH loans, resulting in BTH filing suit against Kenneth to enforce the guaranties BTH understood Kenneth to have signed.

50.    To the extent Kenneth Standley is adjudged or determined to be liable to BTH Bank, N.A., or its successors, for Kenneth's Guaranty Liability to BTH,[152] this Court finds that both his liability and any resulting judgment are nondischargeable against Jason Standley as a debt arising from false pretenses under section 523(a)(2)(A).

51.    Plaintiff, Kenneth Standley, has demonstrated by a preponderance of the evidence that Defendant, Jason Standley, engaged in conduct wronging Kenneth by dishonest methods by signing multiple loan guaranties for Kenneth of BTH's loans without authorization from Kenneth.

---

[151] Ex 9, Pg. 1-2; Ex. 37, Pg. 1-2.

[152] Kenneth's Guaranty Liability to BTH is defined at *supra*, ¶ 31, *Conclusions of Law*.

52.     Plaintiff, Kenneth Standley, has demonstrated by a preponderance of the evidence
        that Defendant, Jason Standley, had the requisite intent to deceive when he signed
        multiple loan guaranties for Kenneth of BTH's loans without authorization from
        Kenneth.

53.     Plaintiff, Kenneth Standley, has demonstrated by a preponderance of the evidence
        that Defendant, Jason Standley, caused Kenneth to be liable for Kenneth's
        Guaranty Liability to BTH.

54.     Plaintiff, Kenneth Standley, has demonstrated by a preponderance of the evidence
        that Defendant, Jason Standley, caused Kenneth damages to the extent he is
        adjudged or determined to be liable to BTH for Kenneth's Guaranty Liability to
        BTH.

55.     Thus, Plaintiff, Kenneth Standley, has sustained his burden of proof that the
        indebtedness allegedly owed to him by Defendant, Jason Standley, defined herein
        as Kenneth's Guaranty Liability to BTH, arose from false pretenses as
        contemplated by § 523(a)(2)(A).

*Actual Fraud*

56.     To have a debt excepted from discharge pursuant to the "actual fraud" provision in
        § 523(a)(2)(A), an objecting creditor must prove that (1) the debtor made
        representations; (2) at the time they were made the debtor knew they were false;
        (3) the debtor made the representations with the intention and purpose to deceive
        the creditor; (4) the creditor justifiably relied on such representation; and (5) the
        creditor sustained losses as a proximate result of the representations. *Selenberg v.
        Bates* (*Matter of Selenberg*), 856 F.3d 393, 398 (5th Cir. 2017); *see also Gen.
        Elec. Capital Corp. v. Acosta* (*In re Acosta*), 406 F.3d 367, 372 (5th Cir. 2005).

57.     Despite these elements of actual fraud, the Supreme Court has ruled that "[t]he
        term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent
        conveyance schemes, that can be effected without a false representation." *Husky
        Intern. Electronics, Inc. v. Ritz*, 578 U.S. 356, 359 (2016). Though it declined to
        adopt a definition of actual fraud for all times and circumstances, the Supreme
        Court did state that "'[a]ctual fraud' has two parts: actual and fraud." *Id.* at 360.
        For fraud to be actual, plaintiffs must make a showing of wrongful intent on the
        part of the defendant. *Id.* Specifically, the Supreme Court described this idea as
        follows:

The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid.* Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud." *Id.*

58.   This intent can be inferred from circumstantial evidence. *Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1287–88 (8th Cir. 1987) (abrogated on other grounds). As with false pretenses or representations, reckless indifference to the truth can in some situations constitute a sufficient showing of wrongful intent to find actual fraud. *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994); *see also Farmers & Merchants State Bank v. Perry* (*In re Perry*), 448 B.R. 219, 226 (Bankr. N.D. Ohio 2011) ("'[W]illful blindness' does not provide a defense to an action brought under § 523(a)(2)(A) and may instead be used as a factor indicative of fraud."); *see also Mid-South Maint., Inc. v. Burk* (*In re Burk*), 583 B.R. 655, 667 (Bankr. N.D. Miss. 2018)("a debtor who recklessly disregards the truth has the requisite wrongful intent for his actions to constitute actual fraud.")

59.   To satisfy the required element of creditor reliance, Plaintiff must prove both actual reliance and justifiable reliance which are determined by two different standards. Actual reliance is the equivalent of causation-in-fact, which is defined as a substantial factor in determining the course of conduct that results in . . . loss." *AT&T Universal Card Services v. Mercer* (*In re Mercer*), 246 F.3d 391, 403 (5th Cir. 2001) (emphasis removed). This level of reliance "requires little of the creditor." *Id.* In the case of loan fraud, "an issuer usually will be able to establish actual reliance by showing it would not have approved the loan in the absence of debtor's promise." *Id.* at 411.

60.   Justifiable reliance, described as "an intermediate level of reliance," is a subjective standard that is more relaxed than the objective reasonable reliance standard. *Field v. Mans*, 516 U.S. 59, 74 (1995). Despite this, reasonableness is still a consideration because "the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Id.* at 76. The promisee is not, however, required to investigate even if an investigation would reveal the falsity of the promisor's representation unless the falsity is

40

"readily apparent or obvious or there are 'red flags' indicating such reliance is unwarranted." *In re Hurst*, 337 B.R. 125, 133-34 (Bankr. N.D. Tex. 2005).

61.   Finally, the creditor must establish that its loss sustained is the "proximate result" or legal cause of the debtor's representation. *State of Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 967 (E.D. Tex. 1997).  Proximate cause is "largely a question of foreseeability." *First Nat'l Bank of Omaha v. O'Brien (In re O'Brien)*, 555 B.R. 771, 782-783 (Bankr. D. Kan. 2016).  Reliance on the debtor's representation is a proximate cause of the creditor's loss "if the evidence shows that the loss was a reasonably foreseeable consequence of the plaintiff's reliance." *Am. Tobacco Co.*, 14 F. Supp. 2d at 967.

62.   Plaintiff, Kenneth Standley, has demonstrated by a preponderance of the evidence that Defendant, Jason Standley, fraudulently signed Kenneth's name to his guaranties of the BTH loan documents doing so without authorization.

63.   Plaintiff, Kenneth Standley, has demonstrated by a preponderance of the evidence that Defendant, Jason Standley, knew he did not have authorization to sign Kenneth's name to his guaranties of the BTH loan documents.

64.   Plaintiff, Kenneth Standley, has demonstrated by a preponderance of the evidence that Defendant, Jason Standley, had the requisite intent to deceive.

65.   Plaintiff, Kenneth Standley, has demonstrated by a preponderance of the evidence that Defendant, Jason Standley, caused BTH to actually and justifiably rely on the accuracy of Kenneth's ostensible signatures to the guaranties of the BTH loans, and further caused Kenneth to justifiably and actually, given their personal relationship, rely on Jason's representations to him regarding the negotiation and status of the BTH loans.[153]

66.   Plaintiff, Kenneth Standley, has demonstrated by a preponderance of the evidence that Defendant, Jason Standley, caused Kenneth to sustain a loss as the proximate result of Jason's representations to the extent of Kenneth's Guaranty Liability to BTH.

---

[153] This finding is not intended to, and expressly does not, determine any issues concerning BTH's potential liability to Kenneth in the ongoing suit between them Cause No. 380-03430-2021 in the 380th Judicial District of Collin County, Texas, styled *BTH Bank, N.A. v. Kenneth Standley, Paul Noonan in his capacity as Co-Trustee of the Jason Standley Trust; and Paul Pogue, in his capacity as Co-Trustee of the Jason Standley Trust*.  BTH is not a party to this adversary proceeding.

41

67.     Thus, Plaintiff, Kenneth Standley, has sustained his burden of proof that
        Kenneth's Guaranty Liability to BTH, the indebtedness owed to him by
        Defendant, Jason Standley, arose from actual fraud as contemplated by §
        523(a)(2)(A).

## 11 U.S.C. § 523(a)(2)(B)

68.     To render a debt nondischargeable under the provisions of 11 U.S.C. §
        523(a)(2)(B), a Plaintiff must demonstrate the following by a preponderance of the
        evidence:

    (1)     that the debtor made a written representation regarding his financial
                condition;

    (2)     that the written representation regarding his financial condition was
                materially false;

    (3)     that the creditor reasonably relied upon the materially false written
                representation; and

    (4)     that the materially false written representation was published by the debtor
                with the intent of deceiving the creditor.

    *See also Choi v. Tan*, No. 4:24-CV-342, 2025 U.S. Dist. LEXIS 58243, at *26
(E.D. Tex. 2025); *Veritex Cmty. Bank v. Osborne* (*In re Osborne*), 951 F.3d 691,
696 (5th Cir. 2020).

69.     These four elements are all questions of fact.  *See Norris v. First Nat'l bank (In re
        Norris)*, 70 F.3d 27, 29 (5th Cir. 1995).

70.     11 U.S.C. § 523(a)(2)(B) does not apply to oral statements.  It only applies to
        statements reduced to writing and produced by a debtor to the creditor.
        *Schneiderman v. Bogdanovich* (*In re Bogdanovich*), 292 F.3d 104, 111 (2nd Cir.
        2002).

71.     A financial statement need not be signed by the debtor to satisfy the threshold
        element of the requirement of a writing; however, it must be shown that the
        allegedly false written statement is properly attributable to the debtor.

72.     "The writing requirement is satisfied if the written statement was signed, adopted
        and used, or caused to be prepared by, the debtor."  *Fairfax State Sav. Bank v.
        McCleary (In re McCleary)*, 284 B.R. 876, 885 (Bankr. N.D. Iowa 2002).

*Materially False Statement*

73.   "A materially false statement is one that paints a substantially untruthful picture of
a financial condition by misrepresenting information of the type which would
normally affect the decision to grant credit." *Renasant Bank v. Goodin (In re
Goodin)*, 2016 WL 587469, at *5 (Bankr. N.D. Miss. Oct. 7, 2016) (quoting
*Jordan v. Southeast Nat'l Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir. 1991)
(ovverruled in part by *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257
(5th Cir. 1993) (en banc)).

74.   A document is considered materially false if it contains information which omits
relevant information or makes it substantially inaccurate. *Stapleton*, 2019 WL
3403355, at *7 (citing *Heritage Bank v. McCracken (In re McCracken)*, 586 B.R.
247, 256 (Bankr. S.D. Tex. 2018)).

75.   Under 11 U.S.C. § 523(a)(2)(B)(ii), the written statement used by the debtor to
obtain credit must be related to the debtor's financial condition.

76.   Subjectively, the relevant inquiry "is whether the complaining creditor would have
extended credit had it been apprised of the debtor's true situation." *McCleary*, 284
B.R. at 885.

*Financial Condition*

77.   To be actionable under § 523(a)(2)(B), the written statement used to obtain credit
must relate to the debtor's financial condition. *See* 11 U.S.C. §523(a)(2)(B)(ii).

78.   Historically, the term "financial condition" in this circuit meant "the general
overall financial condition of an entity or individual, that is, the overall value of
property and income as compared to debt and liabilities." *Bandi v. Becnel (In re
Bandi)*, 683 F.3d 671, 676 (5th Cir. 2012).   However, the United States Supreme
Court has rejected that interpretation as too restrictive.

79.   In a near-unanimous decision in *Lamar,* the Supreme Court held that "a statement
about a single asset can be a statement respecting the debtor's financial condition
under § 523(a)(2)(B) of the Bankruptcy Code." *Lamar, Archer & Cofrin, L.P. v.
Appling*, 138 S.Ct. 1752, 1764 (2018).

80.   In so doing, the Supreme Court rejected the standard that a "statement respecting
the debtor's financial condition" was limited only to a statement that captures the

debtor's overall financial status because such an interpretation reads the term "respecting" out of the statute.  *Id*. at 1761.

81.   "Had Congress intended § 523(a)(2)(B) to encompass only statements expressing the balance of a debtor's assets and liabilities, there are several ways in which it could have so specified…But Congress did not use such narrow language."  *Id*.

82.   "A statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status. A single asset has a direct relation to and impact aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not.  Naturally, then, a statement about a single asset can be a 'statement respecting the debtor's financial condition.'"  *Id*.

*Reliance*

83.   "To meet the reasonable reliance requirement, a creditor must establish two separate, but related, elements: first, that it actually relied on the alleged false statements; and second, that its reliance was reasonable."  *Stapleton*, 2019 WL 3403355, at *8 (citing *Krieger Craftsman, Inc. v. Ostosh* (*In re Ostosh*), 589 B.R. 319, 341 (Bankr. W.D. Mich. 2018) (internal quotations omitted); *see also Maxwell v. Oregon* (*In re Maxwell*), 2019 WL 2266395, at *5, 600 B.R. 62 (B.A.P. 9 Cir. Mar. 27, 2019) ("under § 523(a)(2)(B), the creditor's reliance must be both actual and reasonable.").

84.   If there is not actual reliance, there is no reasonable reliance.  *See Columbo Bank v. Sharp* (*In re Sharp*), 340 F. App'x. 899, 908 (4th Cir. 2009) (citing *Field v. Mans*, 516 U.S. 59, 68 (1995)).

85.   While a creditor must show actual reliance, they do not have to show that they "relied exclusively on the false financial statement.  It is sufficient if the creditor establishes that it relied partially on the false statement."  *Renasant Bank v. Goodin* (*In re Goodin*), 2016 WL 5874969, at *7; *see also Hurston v. Anzo (In re Anzo)*, 562 B.R. 819, 829 (Bankr. N.D. Ga. 2016) ("A financial statement does not have to be the only factor influencing a creditor; partial reliance is all that is needed.").

86.   Within the Fifth Circuit, whether a creditor's reliance was reasonable under 11 U.S.C. § 523(a)(2)(B) is a factual determination made considering the totality of the circumstances.  *Coston*, 991 F.2d at 259.

44

87.  Among the factors to be evaluated in determining the existence of reasonable reliance in a § 523(a)(2)(B) context are:

 (1)  whether there had been previous business dealings with the debtor that gave rise to a relationship of trust;
 (2)  whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and
 (3)  whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.* at 261; *See also Veritex Cmty. Bank v. Osborne (In re Osborne)*, 951 F.3d 691, 697 (5th Cir. 2020); *Shurley v. Shurley (In re Shurley)*, No. 23-50163, 2023 U.S. App. LEXIS 28014, at *8 (5th Cir. 2023).

*Published with Intent to Deceive*

88.  Under 11 U.S.C. § 523(a)(2)(B)(iv), the debtor must cause the false financial statement to be made or published.

89.  Furthermore, 11 U.S.C. § 523(a)(2)(B)(iv) also requires that any published statement must be shown to have been tendered by the debtor with an intent to deceive the creditor.

90.  Because direct evidence of intent to deceive is hard to prove, it can be inferred from the totality of the circumstances under 11 U.S.C. § 523(a)(2)(B). *Young v. Nat'l Union Fire Ins. Co. (In re Young)*, 995 F.2d 547, 549 (5th Cir. 1993).

91.  "[R]eckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce such an inference." *Stapleton*, 2019 WL 3403355, at *8 (citing *Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 482 (5th Cir. 2009) (internal quotations omitted)).

92.  When inferring intent to deceive, the bankruptcy court may consider the debtor's knowledge of experience in financial matters, and whether the debtor showed exhibited a clear pattern of purposeful conduct. *See Western Builders of Amarillo, Inc. v. Morrison (In re Morrison)*, 361 B.R. 107, 124 (Bankr. W.D. Tex. 2007), *aff'd*, 555 F.3d 473 (5th Cir. 2009).

93.   If a creditor establishes that a debtor had actual knowledge of the false statement,
then the debtor will be unable to overcome the inference of intent to deceive with
unsupported assertions of honest intent.  *Stapleton*, 2019 WL 3403355, at *9
(citing *McCracken*, 586 B.R. at 259).

94.   Plaintiff, Kenneth Standley, has failed to demonstrate by a preponderance of the
evidence that the Debtor, Jason Standley, made a written representation regarding
*his or an insider's* financial condition to Plaintiff.

95.   Plaintiff, Kenneth Standley, has failed to demonstrate by a preponderance of the
evidence that Plaintiff reasonably relied upon a materially false written
representation concerning *Debtor's or an insider's* financial condition.

96.   Thus, Plaintiff, Kenneth Standley, has failed to sustain his burden of proof that the
indebtedness allegedly owed to him by Defendant, Jason Standley, arose because
of reasonable reliance on a materially false written statement as contemplated by §
523(a)(2)(B).

97.   Plaintiff, Kenneth Standley, has failed to demonstrate by a preponderance of the
evidence that the materially false written representation was published by the
Debtor, Jason Standley, with the intent of deceiving Plaintiff.

98.   Thus, Plaintiff, Kenneth Standley, has failed to sustain his burden of proof that the
indebtedness allegedly owed to him by Defendant/Debtor, Jason Standley, arose
from a materially false written statement as contemplated by § 523(a)(2)(B).

### 11 U.S.C. § 523(a)(6)

99.   11 U.S.C. § 523(a)(6) of the Bankruptcy Code provides that:

    i.   a discharge under §727 of this title does not discharge an individual
debtor from any debt for money, property, or services, . . . (6) for
willful and malicious injury by the debtor to another entity or to the
property of another entity.   11 U.S.C. § 523 (2020).

100.   The United States Supreme Court has offered its opinion as to what types of
debts Congress intended to except from discharge pursuant to § 523(a)(6).   In
*Kawaauhau v. Geiger*, the Supreme Court stated that:

The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover . . . , the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself." 523 U.S. 57, 118 (1998); citing RESTATEMENT (SECOND) OF TORTS § 8A, comment *a*, p. 15 (1964).

101. The Supreme Court concluded that negligent or reckless acts are not sufficient to establish that a resulting injury is "willful and malicious" and that, therefore, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Geiger*, 523 U.S. at 58.

102. The *Geiger* decision clearly requires that an actor inflict a deliberate or intentional injury, not merely that an actor take a deliberate or intentional act that leads to injury. *Id.*

103. In *Miller v. J. D. Abrams, Inc.* (*In re Miller*), the Fifth Circuit analyzed the *Geiger* ruling to articulate a methodology by which to distinguish between acts intended to cause injury as opposed to those merely leading to injury. 156 F.3d 598 (5th Cir. 1998). The *Miller* court determined that a "willful . . . injury" is established under § 523(a)(6) when there exists either: (1) an objective substantial certainty of harm arising from a deliberate action or (2) there is a subjective motive to cause harm by the party taking a deliberate or intentional action. *Id.* at 604-06. It further determined that the standard for determining the existence of a "willful" injury under *Geiger* had subsumed the Circuit's former standard for determining "malicious" conduct under § 523(a)(6) [i.e. "without just cause or excuse"] and had eliminated any need to conduct a separate analysis on that malice element. *Id.* The "objective substantial certainty" prong is a recognition of the evidentiary reality that a defendant in a bankruptcy context rarely admits any prior action was taken with the intent to cause harm to anyone. *Id.*

104. The objective standard is met when a court finds that a debtor intentionally took action(s) that necessarily caused or were substantially certain to cause the injury. *See Rainey v. Davenport (In re Davenport)*, 353 B.R. 150, 202 (Bankr.

47

S.D. Tex. 2006).   Under the subjective test, a court must find that the debtor intended the actual injury that resulted.  *Id.*   The objective standard recognizes "the evidentiary reality that defendants rarely admit malicious intent." *Yu v. Lau (In re Lau)*, No. 11-40284, 2013 WL 2476359, at *7 (Bankr. E.D. Tex. May 28, 2013).

"A court is thus expected to analyze whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the plaintiff." *Mann Bracken, LLP v. Powers* (*In re Powers*), 421 B.R. 326, 334-35 (Bankr. W.D. Tex. 2009), citing *Berry v. Vollbracht* (*In re Vollbracht*), 276 F. App'x. 360, 362 (5th Cir. 2007).

105.   "Substantial certainty does not mean absolute certainty, but it must be something more than a high probability." *In re Jones*, 655 B.R. 884, 894 (Bankr. S.D. Tex. 2023).

106.   Determining the existence of objective intent is necessarily a fact intensive exercise.  *In re Smith*, 659 B.R. 500, 508 (Bankr. E.D. Tex. 2024).

107.   "Injuries covered by § 523(a)(6) are not limited to physical damage or destruction; harm to personal or property rights is also covered by § 523(a)(6)." *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 698-99 (Bankr. E.D. Tex. 2009).  This means that § 523(a)(6) "applies to 'acts done with the actual intent to cause injury,' *but excludes intentional acts that cause injury*." *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 508 (5th Cir. 2003) (emphasis added) (quoting *Kawaauhau*, 523 U.S. at 61).

108.   It is legally insufficient for purposes of § 523(a)(6) for Plaintiff to demonstrate that Defendant took intentional actions which resulted in an injury to Plaintiff.

109.   Plaintiff, Kenneth Standley, has failed to demonstrate by a preponderance of the evidence the existence of a deliberate or intentional injury inflicted upon him by Defendant, Jason Standley.

110.   Plaintiff, Kenneth Standley, has failed to demonstrate by a preponderance of the evidence that the Defendant, Jason Standley's actions created an objective substantial certainty of harm to Plaintiff.

111.   Plaintiff, Kenneth Standley, has failed to demonstrate by a preponderance of the

evidence that the Defendant, Jason Standley's actions in created a subjective substantial certainty of harm to Plaintiff.

112. Thus, Plaintiff, Kenneth Standley, has failed to sustain his burden of proof that any portion of the indebtedness allegedly owed to him by Defendant, Jason Standley, arose from the infliction of a "willful and malicious injury" as contemplated by § 523(a)(6).

### 11 U.S.C. § 727(a)(4)(A)

113. Plaintiff contends Defendants' discharge should be denied for making a false oath pursuant to 11 U.S.C. § 727(a)(4)(A).

114. 11 U.S.C. § 727(a)(4)(A) provides that:

"(a) The court shall grant the debtor a discharge, unless —

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A)    made a false oath or account . . . ."

115. As one court previously stated, "the bankruptcy schedules and statement of financial affairs of a debtor serve a vital role for creditors in a bankruptcy case, in that they ensure that adequate and truthful information is available to trustees and creditors, not just an objecting creditor, without the need for further investigation to determine whether or not the information is true and correct." *Mullen v. Jones* (*In re Jones*), 2011 WL 479063, at *34 (Bankr. N.D. Tex., Feb. 3, 2011).

116. An individual debtor may forfeit entitlement to a discharge by knowingly and fraudulently making a false oath. "False oaths sufficient to justify denial of discharge include (1) a false statement or omission in the debtor's schedules or statement of financial affairs, or (2) a false statement by the debtor at an examination during the course of the bankruptcy proceedings." *Buckeye Retirement Co., LLC v. Bullough* (*In re Bullough*), 358 B.R. 261, 280 (Bankr. N.D. Tex. 2007).

117. To sustain their contention that Defendants' discharge should be denied for making a false oath pursuant to 11 U.S.C. § 727(a)(4)(A), Plaintiff must establish the following elements: (1) the debtor made a statement under oath; (2) such statement

was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was materially related to the bankruptcy case. *Cadle Co. v. Duncan* (*In re Duncan*), 562 F.3d 688, 695 (5th Cir. 2009); *Beaubouef v. Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992). However, if a plaintiff establishes a prima facie case that a debtor made false statements, then the burden shifts to the debtor to present evidence that she is innocent of the charged offense. *See Cadle Co.*, 562 F.3d at 696.

118. To justify the denial of a debtor's discharge under 11 U.S.C. § 727(a)(4)(A), a false oath may include: "(1) a false statement or omission in the debtor's schedules, or (2) a false statement by the debtor at the examination during the course of the proceedings." *Beaubouef*, 966 F.2d at 178.

119. "[N]ot every misstatement or omission...constitutes a false oath. Indeed, even multiple errors do not mandate the finding of a false oath without sufficient evidence of a fraudulent intent." *Buescher*, 491 B.R. at 432 (citing *Cadle Co. v. Pratt* (*In re Pratt*), 411 F.3d 561 (5th Cir. 2005)).

120. While fraudulent intent can be difficult to prove, a plaintiff may, in the alternative, utilize circumstantial evidence to demonstrate that a debtor made a false statement with reckless indifference to the truth. *Beaubouef*, 966 F.2d at 178.

121. Plaintiff asserts that Debtors "knowingly and fraudulently made false oaths in their June 16, 2022, bankruptcy schedules by: (a) undervaluing their homestead by at least $3 million (based on sale price and renovations); (b) undervaluing horses ($10,000 vs. $65,000), furnishings ($8,200 vs. $24,000–$40,000), and a tractor ($2,500 vs. $43,684); (c) omitting approximately $50,000 in cash deposits; and (d) failing to disclose transfers from P.M. Standley Corporation."[154]

122. With respect to statements under oath allegedly failing to appropriately evaluate the value of the Debtors' homestead, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth Standley, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon Kenneth Standley, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

---

[154] Joint Pre-Trial Ord., 15, ECF No. 120.

123.   With respect to statements under oath allegedly failing to appropriately evaluate the value of two horses, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth Standley, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon Standley, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

124.   With respect to statements under oath allegedly failing to appropriately evaluate the value of Debtors' furniture and furnishings, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth Standley, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon Standley, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

125.   With respect to statements under oath allegedly failing to appropriately evaluate the value of Debtors' tractor, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth Standley, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon Standley, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

126.   With respect to alleged nondisclosure of $50,000 in cash deposits, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth Standley, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon Standley, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

127.   With respect to alleged nondisclosure of transfers from P.M. Standley Corporation, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth Standley, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon Standley, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

128.   Defendant recites that "Plaintiff alleged false oaths regarding the Debtors' valuations given in the Schedules of their (a) home, (b) horses, (c) jewelry and (d) furniture and furnishings, and alleged non-disclosure by the Debtors of (e) gifts to one of their sons, Preston Standley, (b) a bank account at Frost Bank, and (c)

income from 2020." [155]  These recitals show overlap with those above of Plaintiff, and the Court need not repeat its ruling regarding valuation of Defendants' home, horses, furniture and furnishings.

129.   With respect to statements under oath allegedly failing to appropriately evaluate the value of jewelry, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth Standley, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon Standley, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

130.   With respect to alleged nondisclosure of gifts to Preston Standley, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth Standley, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon Standley, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

131.   With respect to nondisclosure of a bank account at Frost Bank, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth Standley, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon Standley, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

132.   With respect to nondisclosure of income from 2020, the Court concludes in applying the above standards to the evidence that Plaintiff, Kenneth, failed to sustain his burden and prove by a preponderance of the evidence that Defendants, Jason and Shannon, made a false statement under oath regarding such matters sufficient to deny them a discharge under 11 U.S.C. § 727(a)(4)(A).

### III.  Affirmative Defenses

133.   Defendants' Original Answer includes affirmative defenses alleging that:

   (1)  Kenneth's complaint is barred because he did not rely or reasonably rely on any representations, if any, by Jason.
   (2)  Kenneth's complaint fails to state a claim upon which relief may be granted.

---

[155]  Joint Pre-Trial Ord., 4, ECF No. 120.

(3) Kenneth's complaint is barred due to his own acts and/or omissions.

(4) Kenneth's failed to mitigate his damages.

(5) Kenneth's complaint is barred by unclean hands and equitable estoppel.

(6) Kenneth's complaint is barred due to intervening, independent and/or superseding cause.

(7) Kenneth's damages were caused by his own acts or omissions.

134. A defendant carries the burden on his own affirmative defenses. *See In re Ecco Drilling Co., Ltd.*, No. 07-60987, 2011 WL 3585633, at *5 (Bankr. E.D. Tex. Aug. 12, 2011).

135. "An affirmative defense is subject to the same pleading requirements as is the complaint." *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999). "Even though the aim of the relaxed notice pleading standards of Federal Rule of Civil Procedure 8 is to prevent parties from being defaulted for committing technical errors, a defendant nevertheless must plead an affirmative defense with enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced." *Id.*

136. Nevertheless, the Fifth Circuit has recognized that "in some cases, merely pleading the name of the affirmative defense ... may be sufficient." *Woodfield*, 193 F.3d at 362; *see Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 598 F. Supp. 3d 520, 531 (S.D. Tex. 2022).

137. Kenneth's complaint is not barred because he did not rely or reasonably rely on any representations, if any, by Jason. The Court understands this portion of Defendants' answer, rather than pleading a clear affirmative defense, to instead argue that Kenneth cannot show any representations sufficient to find Jason liable under section 523(a)(2)(A). For the reasons explained above, the Court finds Jason liable under the false pretenses and actual fraud components of section 523(a)(2)(A), both of which may be successfully proven without an express representation.

138. Kenneth's complaint does not fail to state a claim upon which relief may be granted. The Court has written several times on the well-established standards governing whether a complaint fails to state a claim upon which relief may be granted. *See MMWKM Advisors, LLC v. Dowdall (In re Dowdall)*, Nos. 24-42950, 25-04025, 2025 LX 216157 (Bankr. E.D. Tex. 2025); *In re McCain*, 652 B.R. 678 (Bankr. E.D. Tex. 2023); *Blanchard v. Folkman (In re Folkman)*, Nos. 20-40864, 20-4083, (Bankr. E.D. Tex. 2022); *Blanchard v. Folkman (In re Folkman)*, Nos. 20-40864, 20-4083, (Bankr. E.D. Tex. 2022); *In re Alhuneidi*, 632

B.R. 737 (Bankr. E.D. Tex. 2021); *Weisbart v. Pettit (In re Pettit)*, Nos. 20-41570, 21-04011, (Bankr. E.D. Tex. 2021). Kenneth's complaint meets these standards. This affirmative defense fails.

139. Kenneth's complaint is not barred due to his own acts and/or omissions. The Court heard little, if any, evidence that would lead it to find that Kenneth took actions which would make him responsible for incurring Kenneth's Guaranty Liability to BTH. Kenneth did not sign the guaranties of the BTH loans, and did not give Jason his authorization to do so. This affirmative defense fails.

140. Kenneth's complaint is not barred due to intervening, independent and/or superseding cause. No credible evidence of an intervening, independent, or superseding cause which could give rise to Kenneth's Guaranty Liability to BTH was provided by Defendants at trial. This affirmative defense fails.

141. Kenneth's damages were not caused by his own acts or omissions. No credible evidence of what acts or omissions taken by Kenneth which gave rise to Kenneth's Guaranty Liability to BTH was provided by Defendants at trial. This affirmative defense fails.

142. Kenneth has not failed to mitigate damages. Defendants allege this because they argue Kenneth could and should have settled with BTH, and so in their judgment not doing so equates to a failure to mitigate damages sufficient to excuse Jason's fraudulent conduct. Neither the Court nor the evidence agrees with this contention. It is unclear what a hypothetical settlement between Kenneth and BTH would or could have been. The Court will not penalize Kenneth for not settling a dispute with BTH which would, hypothetically, have required him to pay some portion of Kenneth's Guaranty Liability to BTH. Kenneth's Guaranty Liability to BTH is the result of Jason's actions, not Kenneth's failure to settle with BTH once he had been sued. This affirmative defense fails.

143. Under the doctrine of unclean hands, a court may refuse to grant equitable relief to a plaintiff who has been guilty of unlawful or inequitable conduct regarding the issue in dispute. *See Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex.App.—Fort Worth 2008, pet. denied). In the bankruptcy context, another court recently wrote that " . . . a defendant in a section 523 action can still claim 'unclean hands' or wrongful conduct by the plaintiff deemed bad enough to foreclose the plaintiff's right to have its debt declared non-dischargeable." *Tower Credit, Inc. v. Smith* (*In re Smith*), Nos. 24-10786, 24-1037, 2025 Bankr. LEXIS 1325, at *10-11 (Bankr. M.D. La. 2025), citing *Adair v. Stutsman Construction, LLC* (*Matter of Adair*), No. 24-30273, 2025 U.S. App. LEXIS 12239, 2025 WL

1439450 (5th Cir. May 20, 2025).  The party claiming unclean hands needs to show it was ". . . injured by the other party's unlawful or inequitable conduct." *Paciwest, Inc.,* 266 S.W.3d at 571.

144.   Defendants have not provided any evidence showing any unlawful or inequitable conduct on Kenneth's part, nor that they were seriously harmed by any such conduct.  Defendants' unclean hands affirmative defense fails.

145.   To the extent any other affirmative defenses are included in the pre-trial order which answer was not pled in Defendants' answer, they are rejected.  Awarding Defendants relief on any such affirmative defenses would be unfairly prejudicial. *Simmons v. Simmons* (*In re Simmons*), Nos. 23-10130, 24-1006, 2025 Bankr. LEXIS 1382, at *19 (Bankr. E.D. Tex. 2025)

## IV.  Conclusion

1.   Because the Court concludes that Plaintiff, Kenneth Standley, has proven by a preponderance of the evidence that Kenneth's Guaranty Liability to BTH was obtained by false pretenses of Defendant, Jason Standley, judgment must be rendered for Plaintiff under the false pretenses component of 11 U.S.C. § 523(a)(2)(A).

2.   Because the Court concludes that Plaintiff, Kenneth Standley, has proven by a preponderance of the evidence that Kenneth's Guaranty Liability to BTH was obtained by actual fraud, judgment must be rendered for Plaintiff under the actual fraud component of 11 U.S.C. § 523(a)(2)(A).

3.   Because the Court concludes that the Plaintiff, Kenneth Standley, has failed to demonstrate by a preponderance of the evidence all elements required to establish his cause of action under 11 U.S.C. § 523(a)(2)(B), judgment under that provision must be rendered for the Defendant, Jason Standley, in this action.

4.   Because the Court concludes that Plaintiff, Kenneth Standley, has failed to prove by a preponderance of the evidence that Kenneth's Guaranty Liability to BTH arose from a willful and malicious injury inflicted upon him by Defendant, Jason Standley, judgment must be rendered for the Defendant under 11 U.S.C. § 523(a)(6).

5.   The Court concludes that Plaintiff, Kenneth Standley, has failed to prove by a preponderance of the evidence that Defendants, Jason Standley and Shannon Standley, should be denied a discharge under 11 U.S.C. § 727(a)(4)(A) for making

false oaths.  Therefore, judgment must be rendered for the Defendants under 11
U.S.C. § 727(a)(4)(A).

6.    Because of the denial of Plaintiff's cause of action under section 727(a)(4)(A),
Defendants, Jason Standley and Shannon Standley, are entitled to and shall be
granted by this Court a discharge under 11 U.S.C. § 727.

7.    To the extent any of these conclusions of law constitute findings of fact, the Court
expressly adopts them as such.

8.    An appropriate judgment shall be entered consistent with these findings and
conclusions.

Signed on 9/30/2025

_____
THE HONORABLE JOSHUA P. SEARCY
UNITED STATES BANKRUPTCY JUDGE